## WARD v. UNITED STATES.

An ancient claim against the United States, founded on loan certificates issued by the Continental Congress in 1777, and sent to the loan office in Georgia, to be given in exchange for money when countersigned by the loan officer of that State, rejected; there being no sufficient evidence that the certificates were countersigned and issued as required by the legislation which authorized them; the same claim having been rejected in 1792 by Alexander Hamilton, then Secretary of the Treasury, and there being no sufficient evidence now that the facts then assumed by him as the basis of his conclusions were unfounded. The claim being moreover considered by this court as without equity.

APPEAL from the Court of Claims; the case being thus:

The Continental Congress, on the 3d day of October, 1776, being in want of five millions of dollars to prosecute the war, resolved to borrow it on what were called loan-

office certificates, and to establish a loan office in each State for the convenience of the lenders of money. The resolution directed the appointment by the authority of the State of a commissioner of loans, whose duty it was to receive the certificates from the Treasurer of the United States, and to deliver them for such sums of money as he should be able to borrow. The faith of the government was pledged to redeem these certificates when countersigned by this officer.

In continuation of its policy on this subject, Congress, on the 15th of January and the 22d of February, 1777, provided for a further issue of this class of securities on the basis of the resolutions of the preceding October. Accordingly, certificates in proper form, duly signed by the designated Federal officer, were transmitted to the different loan offices of the country to be given in exchange for money, when countersigned by the loan officer of the State. Some of these certificates were sent to the loan office of Georgia, and among them forty-three, now in the possession of one Ward, as treasurer of a company called the Ohio Company, an old land·company composed originally largely of Revolutionary soldiers, and which forty-three certificates made the foundation of the claim in the court below. His petition alleged that they were duly issued and in possession of a *bonâ fide* holder on December 23d, 1781, and about 1787 came into the possession of the Ohio Company, and he now claimed payment from the United States; representing apparently the Ohio Company, the real owner in the matter.

The Court of Claims decided at first in favor of the claim, but the matter was referred back by Congress for a further consideration.

On this second hearing the court found as matter of .fact thus:

" 2. That it was unknown and could not be ascertained who was the commissioner for the State of Georgia, or whether any such commissioner had been appointed and authorized to countersign such loan certificates; that at the time of the transaction there was no formal loan office in Georgia, and that a large part of the State was in the possession of the public enemy.

"3. That the said loan certificates were not signed by any duly authorized commissioner for the State of Georgia, but that they bore a certificate in the words following, to wit:

"'Countersigned: By order of J. A. Treutlin, Esq., Governor of Georgia.                                                    E. DAVIS, JR.'

"4. That there was no evidence to show that E. Davis, Jr., was a commissioner for Georgia, or that he was ever reputed to be such, or that he was authorized to countersign such loan certificates by the State or by the governor of Georgia, or that these are the veritable signatures of E. Davis, Jr.

"5. That interest on certain loan certificates, similar to those in action, was paid by the Treasury Department up to the 23d December, 1781, and that on twenty-nine of the certificates in action interest for four years has also been paid by the defendants, and duly noted and indorsed thereupon, and that no objection to these or similar loan certificates, or to the authority of E. Davis, Jr., to act as commissioner, was taken by the defendants until the year 1792.

"6. That no direct consideration or value ever passed to the defendants from the claimant or from any other person for the said loan."

In regard to the question about which the Court of Claims certified that no evidence showed it, to wit, whether E. Davis, Jr., was commissioner of loans for the State, &c., it appeared that the questions had been considered in 1792 by Mr. Hamilton, then Secretary of the Treasury, and that in a report dated the 28th of March, 1792, and published at the time, he stated as the result of "diligent inquiry" on the subject, that he had been unable to obtain evidence either of the appointment of E. Davis to the office of commissioner of loans for Georgia, or that he was ever known or reputed to have acted in that capacity; and that there was no evidence that the paper which he put in circulation had been issued for any purpose of the United States. With this report papers were transmitted to Congress tending to justify his conclusion, and to show that the certificates were placed in the hands of Davis by the executive council of Georgia, to purchase goods for the State. These papers con-

sisted of an affidavit of John Wereat, auditor of Georgia, and a long time resident there, denying that Davis, whom he well knew, was at any time commissioner of loans; of letters from Richard Wyllzhyr, commissioner of loans of the State in 1791, giving his opinion to the same effect, and a communication from Samuel Steick, of Governor Houston's staff, that the certificates were issued on State account.*

The payment of interest Secretary Hamilton conceived to have been unauthorized, and made by mistake of one of the treasurers, a certain Hillegas. He notes that such mistakes had occurred, and that there were examples of payment on both forged and counterfeit certificates; a payment which he observes "could not confer validity upon a claim originally destitute of it, though it might occasion hardship to individuals, who, on the faith of that payment, might have been induced to become possessors of these certificates for a valuable consideration." There was, however, no intimation that such was the case with regard to these certificates.

In 1795 the same certificates apparently were presented by one Tracy "for Benjamin Talmadge,"† who sought to have them funded, but, in consequence of the objections previously made to them by Mr. Hamilton, they were rejected.

According to a statement of Ward, found among the public documents,‡ the certificates were presented to the treasury in 1792 by Mr. Talmadge (who was treasurer of the Ohio Company from 1791 until 1825), and remained there until 1812. In that year having, according to this statement of Ward, been sold by Mr. Talmadge, treasurer of the company, at public auction, and bought by one John Delafield (though still according to Ward's statement considered the property of the Ohio Company), the certificates were withdrawn from the treasury, and Congress was asked to pay them, on the petition of Delafield, who states in his petition that he owned them, and wished them funded for his benefit:

---

* See American State Papers, class ix, vol. Claims, pp. 464–5.

† Ib. 179.

‡ See Report, No. 101, House of Representatives, 19th Congress, 1st session, by Mr. Little, from the Committee on Revolutionary Claims.

Before the committee of Congress which had charge of the subject, and of which Mr. Talmadge was chairman, many letters and documents were produced; letters from Major Hugh McCall, a revolutionary officer of Georgia, and others, to show that the claim was well founded; among them a letter giving a history of the two persons already named (Wereat and Steick), who had certified in the papers accompanying Mr. Hamilton's report, in a way which made against the claims; Major McCall's letters tending to prove that Wereat and Steick were uninformed of the passing events during Governor Treutlin's administration; also a certificate of Sheftall, Esq., stating that E. Davis did in the latter part of 1777 receive an appointment from Governor Treutlin "similar to that of commissioner of loans," and countersign certificates. Divers well-known persons testified that Mr. Sheftall's integrity was great, and his knowledge of events in the revolutionary war was supposed to be superior to that of any person living; that he had "an unusually strong memory," and that they would consider him in 1816 quite competent to speak about the matter in question.

The committee, of which Mr. Talmadge was chairman, reported in successive sessions of the Fourteenth Congress in favor of the payment.* But Congress did not pay the claim.

On the case as found by them the Court of Claims decided as matter of law:

"1. That no cause of action would arise upon the said loan certificates unless the same were duly countersigned by a commissioner for the State of Georgia.

"2. That in the absence of other evidence the indorsements of E. Davis, Jr., did not raise a legal presumption that E. Davis, Jr., was a commissioner for the State of Georgia, or that he was authorized to countersign such certificates, or that the signatures are the veritable signatures of the said E. Davis, Jr.

---

* See American State Papers, vol. Claims, p. 463, report 296, 1st session, 14th Congress; Ib. p. 496, report 325, 2d session of the same Congress.

"3. That the payment and cancellation of certain similar loan certificates and the payment of interest for four years upon certain of the loan certificates in action did not raise a legal presumption that E. Davis, Jr., was a commissioner for the State of Georgia, or authorized to countersign such loan certificates, and do not estop or conclude the defendants from controverting such authority and signature."

The claimant now brought the case here.

*Mr. Stanbery and Mr. T. Ewing, Jr., for the appellant:*

This claim is old, but not by the fault of the claimant; for until 1855 there was no forum provided by the United States to hear and decide it. Meanwhile, as is matter of historical knowledge, all the executive records in Georgia were destroyed by fire, in 1780.* And "the papers of the State of Georgia, on which a settlement was made by the United States with that State," were burned in August, 1814; with other records of the United States Treasury.†

Evidence of contemporaries abundant to prove the claim‡ perished before the United States provided a court to hear or perpetuate it. The time of the issue was not favorable to strict method in governmental transactions, and they were very loosely conducted. These certificates were executed and sent to Georgia while the Continental government was on the wing from Philadelphia to Lancaster, and thence to Yorktown.§ The date was left blank, and apparently also the name of the payee, to be filled up by the State agent, and they were charged in the first instance to nobody. The State was at that time invaded and this fund was sent to enable the local government and forces to make head against the enemy, which soon after overran the rest of Georgia, took its capital, and drove its executive officers from the State.‖

In a report to the House of Representatives, in 1797,¶ the

---

* Statement of Peter Deveaux, member of Executive Council, American State Papers, vol. Claims, p. 599.

† Report of Register of the Treasury, 1816, Ib. p. 466.

‡ Ib. 599.     § 3 Journals, 400.     ‖ Lee's Memoirs, vol. i, p. 68–70.

¶ American State Papers, vol. Claims; p. 202.

Honorable Dwight Foote, chairman of the committee on claims, said :

"It will be recollected that at the commencement of the war the United States were destitute of money, and during a long period of years afterwards were obliged to rely principally on credit in all of their important operations. Having at that time no settled National government, a regular system for conducting public business, especially money transactions depending on credit, was not to be expected. Great numbers of individuals were necessarily invested with the power of binding the public by their contracts. Almost every officer of the army, whether in the commissary department or otherwise, in different stages of the war, had it in his power to contract debts legally or equitably binding on the United States."

In view of these circumstances, this case should be judged without unfriendly presumptions from the absence of evidence which perished by time or fire before a court was allowed to hear or perpetuate it, or from that apparent want of method in the transaction which came of the exigencies of the Revolution, to promote which these certificates were expended.

But the positive recognition of the claim is great. The payment of interest for four years, which was of course indorsed on the certificate, gave them a currency which was above all reproach. They were payable to bearer. The report of 1792, doubtless prepared by a clerk, bears the signature of Alexander Hamilton, and the shadow of his great name seems to have thenceforth obscured the case. But that report was largely founded on the testimony of Wereat and Steick, whose knowledge, the far better information of Mr. Sheftall shows to have been bad, in regard to the relation which E. Davis, Jr., bore to these certificates; and in this tribunal no name, however high, and no error, however ancient or often repeated, if finally refuted, should stop the course of justice.

*Mr. Talbot, for the United States,* relied largely upon the report of Mr. Hamilton, whose knowledge was contempo-

rary knowledge, and who above all statesmen of the day would have paid any claim against the United States which was not plainly unfounded. There was no evidence whatever that he suffered his clerks to make reports for him on subjects involving the credit and good faith of the United States.

Mr. Justice DAVIS delivered the opinion of the court.

The United States deny their obligation to pay the certificates in controversy, because they were not countersigned in conformity with the prescribed regulation of Congress, nor used for their benefit. It will be conceded, if they were not executed as required by the legislation on the subject, that they were irregularly issued, and the United States under no obligation to pay them unless they are estopped in some way from interposing this defence.

It becomes, therefore, of importance, in the first instance, to ascertain whether E. Davis, Jr., who countersigned them, as he says, by order of J. A. Treutlin, governor of Georgia, was commissioner of loans for the State, and whether he negotiated them on account of the United States.

Fortunately, these questions were considered in 1792 by Alexander Hamilton, then Secretary of the Treasury, who was charged by Congress with their investigation. In his report of the 28th of March of that year, he states as the result of diligent inquiry on the subject, that he had been unable to obtain evidence either of the appointment of E. Davis to the office of commissioner of loans for Georgia, or that he was ever known or reputed to have acted in that capacity, and that there was no evidence that the paper which he put in circulation had been issued for any purpose of the United States. With this report papers were transmitted not only justifying the conclusion reached by the Secretary, but tending strongly to show that the certificates were placed in the hands of Davis by the executive council of Georgia to purchase goods for the State. These papers consist of an affidavit of John Wereat, auditor of Georgia, and a long time resident there, denying that Davis, whom

he well knew, was at any time commissioner of loans; of letters from Richard Wyllzhyr, commissioner of loans of the State in 1791, giving his opinion to the same effect, and a communication from Samuel Steick, of Governor Houston's staff, that the certificates were issued on State account.* This report, with the accompanying papers, was published, and, of course, read by the holders of the disputed paper. If in their power to deny it, interested as they were to do so, it would at least have been attempted. As no contradictory proof was furnished to the Treasury Department, always ready and willing to receive it, it is fair to infer that none existed. But this consideration did not prevent the holders of this paper from seeking to get it funded in 1795. They were met by the accounting officers of the treasury with the same objections taken by Mr. Hamilton, and, as these were not removed, the same result followed. In this condition of things, if the controversy had been between individuals, and there had been another forum to hear and decide it, it would have been resorted to at once, unless the decision of the first tribunal was accepted as final. But the holders of these certificates acted differently. Instead of taking an immediate appeal to Congress from the decision of the treasury, they waited until two decades had passed away. Nahum Ward says that these identical certificates were presented to the treasury in 1792, by Mr. Talmadge, and remained there until 1812, when they were withdrawn and Congress asked to pay them, on the petition of John Delafield, who professed to possess them in his own right.† Why this delay of twenty years? No reason is even suggested for it, and none can be given which is consistent with the conduct of men in the ordinary affairs of life. It is absurd to suppose that any one, informed of the grounds of objection to a controverted claim, if there were evidence to remove them, would delay action on the subject until

* See American State Papers, class ix, vol. Claims, pp. 464, 465.

† See Report No. 101, House of Representatives, 19th Congress, 1st session, by Mr. Little, from the Committee on Revolutionary Claims.

thirty-four years had passed since the transaction, out of which the claim had arisen, occurred.

It is said the forum was changed because of newly discovered evidence, and for proof of this we are referred to the reports of Mr. Talmadge, chairman of the committee, on the petition of John Delafield, made to Congress in 1816 with the accompanying papers. It is hard to reconcile these reports with the ownership of the property as claimed by Nahum Ward. He says the Ohio Company has owned the forty-three certificates since 1791, and yet Delafield stated in his petition that he owned them, and wished them funded for his benefit, and we must suppose the Congress of that day, and especially Mr. Tallmadge, believed the fact to be as stated by Delafield. At any rate the Ohio Company is estopped from denying the change of ownership, as Ward says that Mr. Talmadge, who was treasurer of the company from 1791 until 1825, was ordered to sell the certificates by the company, and did sell them at public auction to Delafield. It is true he couples this statement with another, that, notwithstanding Delafield's purchase, they were considered as the company's property; but this would place Mr. Talmadge in the predicament of aiding, while a member of the National legislature, to procure the payment of a disputed debt for a company of which he was an important officer.*

And why the necessity of selling at all unless there were an honest purpose of parting with the title to the property? It surely was as easy to prosecute a just claim before Congress in the name of a corporation as in the name of a natural person. If, then, Delafield purchased the claim free from any trust, as we are bound to suppose in order to relieve the Ohio Company and their treasurer from censure, he did it at his own risk and for a venture, and took it subject to all equities. He cannot plead want of notice of the defences interposed by the United States, because the company of whom he bought, and of which he was a member,

---

* See Report, No. 101, House of Representatives, 19th Congress, 1st session.

were well informed on the subject. It does not appear how or when the title got back in the Ohio Company, nor is it of any consequence, as the company occupies the same position in this litigation that Delafield would had he retained the ownership of the certificates.

But, apart from this view of the subject, these reports do not change the status of the parties to this controversy. The evidence they furnish comes too late, is chiefly hearsay in its character, and should have no weight in the determination of the questions in dispute. It consists mainly of lengthy letters from Major Hugh McCall, of Georgia, addressed to Mr. Talmadge, which seem to be in the nature of arguments against the position taken by the government. One of them is devoted to a futile effort to prove that Wereat and Steick were uninformed of the passing events during Governor Treutlin's administration. It is true the certificate of Mr. Sheftall tends to show that Davis did act in the capacity of commissioner of loans, but although it is certified that he had an unusually strong memory, we place but little reliance on his recollection in 1816, of what transpired in the commissary department of Georgia in 1777–78. Especially do we distrust his memory of these events when it is in opposition to the recollection of others, equally trustworthy, who testified in 1792, twenty-four years nearer the time when the certificates were put in circulation.

It is urged that the United States is not in a position to contest the validity of these certificates, because of the payment of interest for a period of four years. The report of Mr. Hamilton takes the ground that the interest was paid by the mistake of the treasurer, and without authority, and therefore not binding on the United States. It is very clear that there was no *purpose* on the part of the government to ratify the acts of Davis, for the paper bearing his name was rejected, as soon as the attention of the proper department was called to it. But it is not necessary to discuss the general rules of law on the subject of ratification, and to show in what state of case they are applicable, for, in our judgment, under the circumstances of the claim, as they appear

in this case, there is no equity raised in favor of the Ohio Company against the United States.

Without pursuing the subject further, or noticing the various reports in Congress adverse to this claim, we are satisfied it is not a just charge on the treasury of the United States.

JUDGMENT AFFIRMED.

Mr. Justice FIELD, dissenting:

I dissent from the judgment of the court in this case. I am of opinion that the demand of the plaintiff is a just obligation of the United States, as binding as any part of the public debt of the country.