KIRWAN et al. v. MURPHY et al.

(Circuit Court of Appeals, Eighth Circuit. September 27, 1897.)

No. 936.

1. SURVEY OF PUBLIC LANDS—MEANDER LINE OF LAKE—BOUNDARY LINE OF ABUTTING LANDS.

Where a government survey lays down a meander line next to a lake, and the plat returned to the general land office, and referred to in the patents for identification of the lands granted, exhibits the granted tracts as bordering upon the lake, the waters of such lake, and not the meander line, is the fixed boundary of the lands conveyed.

2. RIPARIAN OWNERSHIP—NONNAVIGABLE LAKES—MINNESOTA LAW.

The law of Minnesota in regard to the rights of riparian owners is the common law, and the rule applied by the common law to nonnavigable streams is applicable as well as to nonnavigable lakes.

3. EQUITY JURISDICTION—REMEDY AT LAW—RESURVEY OF PATENTED LANDS—ENJOINING GOVERNMENT OFFICIALS.

Where a bill seeks to enjoin a resurvey, by government officials, of patented lands bordering on a lake, and it appears that it will result in the necessary destruction of much valuable timber, cast a cloud upon the title to lands for which the government has already issued its patents, and involve the owner in a multiplicity of suits to defend and maintain his title, his remedy at law is inadequate, and equity will interfere to prevent the threatened trespass.

4. PATENTED LANDS—CONTROL AND REMEDY OF GOVERNMENT.

When the government has parted with its title to public lands by issuing its patent therefor, it has no right or authority to further control over them. If fraud, wrong, or error has been committed, the government, like any other grantor, must resort to the court for redress.

Appeal from the Circuit Court of the United States for the District of Minnesota.

This was a bill in equity by Simon J. Murphy, George O. Robinson, Elisha H. Flinn, and Temple E. Dorr to enjoin P. H. Kirwan, as United States surveyor general for the district of Minnesota, and Thomas H. Croswell, from making a resurvey of certain lands. The circuit court made an order for a temporary injunction, and the defendants have appealed therefrom.

John R. Van Derlip (Edward C. Stringer was with him on the brief) for appellants.

M. H. Stanford, for appellees.

Before SANBORN and THAYER, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This was a bill in equity filed by Simon J. Murphy and others, the appellees, for an injunction restraining and

enjoining P. H. Kirwan and Thomas H. Croswell, the appellants, from making a survey of certain lands surrounding Cedar Island Lake, in township 57 N., of range 17 W. of the fourth Principal Meridian, in St. Louis county, Minnesota, the survey of the lands having been ordered by the land department of the United States. The defendant Kirwan is the United States surveyor general for Minnesota, and the defendant Croswell is a deputy surveyor, with whom a contract has been made by order of the commissioner of the general land office to make the survey. At the time the bill was filed, the circuit court directed that an order to show cause be served upon the defendants, and issued a temporary restraining order, restraining the defendants from entering into or perfecting a contract for the survey until the further order of the court. Subsequently, a motion to discharge the order to show cause was made by the defendants and was overruled. Thereupon the defendants filed their joint and several answer, supported by affidavit, and the cause came on for hearing upon the order to show cause why a temporary injunction should not issue. The court directed a temporary injunction to issue, and it is from this order that the appellants appealed.

The record discloses substantially the following facts: The township was surveyed by the United States government in 1876, and the plat made pursuant to the survey was approved by the government as the official plat of the township on June 11, 1879. All of the lands in the township were, according to the government plat, disposed of and patented by the government to divers persons between December, 1879, and March, 1884, the following lands being owned by the appellees:

"Commencing at the southwest corner of lot four (4) of the northwest quarter (N. W. ¼) of section one (1), and running thence north, on the section line between said section one (1) and two (2), and to the northwest corner of said section one (1); thence west, on the north line of said township, to a point where said town line first meets the shore of Cedar Lake; thence turning south, and following the shore of said lake, to a point where the south line of said lot four (4) in said section one (1), extending westerly into said section two (2), first meets the water of said lake; thence easterly, on said last-mentioned line, to the place of beginning,—the same being lots one (1), two (2), and three (3) of said section two (2), according to the government plat thereof; also commencing on the west shore of said lake at a point in said section three (3) where the west shore of said lake crosses said north town line; thence following said town line to the northeast corner of lot two (2) of section four (4); thence running southerly, on the east line of said lot two (2) in said section four (4), to the southeast corner thereof; thence westerly, along the south boundary line of said lot two (2), to the southwest corner thereof; thence southerly, and to the center of said section four (4); thence southeasterly, on a straight line from the center of said section, to the southeast corner thereof, until it intersects the westerly shore of said lake on said section four (4); thence in a northerly direction, along the shore of said lake, to the place of beginning,— the same being lots one (1) and two (2) of section three (3), lot one (1) of section four (4), and a portion of lots six (6), seven (7), and the whole of lot eight (8) in said section four (4); also commencing at a point in the section line between sections four (4) and nine (9), at a point where the westerly shore of said lake crosses said line; thence westerly, on said section line, and to the northwest corner of said section nine (9); thence south, on the west line of said section nine (9), to the southwest corner of the northwest quarter (N. W. ¼) of the southwest quarter (S. W. ¼) of said section nine (9); thence following the south line of said last-described line, and the extension thereof,

until it intersects the center line running north and south through section ten (10); thence north to the center of said section ten (10); thence easterly, on the center line of said section ten (10), to the northwest corner of the southwest quarter of section eleven (11); thence south, on the west line of section eleven (11), to the southwest corner of the northwest quarter (N. W. ¼) of the southwest quarter (S. W. ¼) of said section eleven (11); thence east to the southeast corner of the northwest quarter (N. W. ¼) of the southwest quarter (S. W. ¼) of said section eleven (11); thence north until it intersects the southerly meander line of said lake; thence turning at right angles to said meander line, and run to the shores of said lake; thence westerly, and following the shores of said lake, to the place of beginning."

The government plat is erroneous in many instances, errors being general throughout the entire township. In the northern portion of the township, Cedar Island Lake is much smaller than shown on the official plat, thus making the fractional lots owned by the appellees, lying about and bordering on the lake, much larger than they appear on the plat. The order for a resurvey covers but a small portion of the township, being only for the fractional lots bordering on Cedar Island Lake in sections 2, 3, 4, 9, 10, and 11. It is not insisted that the appellees or any of their grantors had knowledge of any fraud in connection with the original survey from which the government plat was made. The lands in controversy in this case are described in the patents as fractional lots according to the official plat of the survey. In 1893, certain parties having settled on portions of these fractional lots, application was made by them to the commissioner of the general land office for a survey thereof, and denied. An appeal was taken from the decision of the commissioner of the general land office to the secretary of the interior, and upon a hearing an order was made by the secretary of the interior directing a survey of the portions of the fractional lots lying between the actual waters of Cedar Island Lake and the meander line as shown on the plat. The greater portion of the land is covered by valuable pine timber, and it is insisted by the appellees that a new survey would necessitate cutting a clear transit line through the heavy timber; that the timber would thereby be destroyed; that they would suffer great and irreparable injury, and that a cloud would be cast upon their title.

The government survey made in 1876, upon which the patents were issued, laid down a meander line next to the lake, and the plat of the survey returned to the general land office, and referred to in the patents for identification of the lands granted, exhibited the granted tracts as actually bordering upon the lake. The patents do not contain all of the particulars of the survey, but the grant of the lands is recited to be according to the official plat of the survey returned to the general land office by the surveyor general, thereby adopting the plat as a part of the instrument. Meander lines are run along or near the margin of nonnavigable streams and inland lakes for the purpose of ascertaining the exact quantity of the upland to be charged for when the land is sold by the government, and not for the purpose of limiting the title of the grantee to such meander lines. The meander lines are intended for the purpose of bounding and abutting lands granted upon the waters whose margins are thus meandered, and the waters themselves, not the meander line, constitute

the real boundary. "Meander lines," said Mr. Justice Clifford in the case of Railroad Co. v. Schurmeir, 7 Wall. 272, 286, "are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows to a demonstration that the water course, and not the meander line as actually run on the land, is the boundary."

We think it is well settled that, in all of the states where the common-law rule is in force, the title of the purchaser from the general government of lands bordering on nonnavigable waters within the state extends to the waters meandered, although the meander line of the survey be found to be not coincident with the shore, and, in a case where the surveyed meander line fails to conform to the shore of the waters meandered, that the fixed boundary or monument is to prevail, and the surveyed line must be disregarded. And, while the price of the land sold by the government is computed upon the assumption that the meander line and the boundary line (that is to say, the shore) are identical, that does not affect the extent of the grant made by the patent, as the stream or other body of water, and not the meander line, must be held to be the fixed boundary of the land conveyed. The rule at common law was that a grant of land bounded by a stream of water, if the stream was a navigable stream, passed the title to the land to high-water mark. If the stream was not navigable, the rights of the riparian owner extended to the center thread of the current. The question whether the common-law rule is in force in the state of Minnesota, and, if so, whether it applies to inland lakes not navigable as well as to nonnavigable streams, is a question to be determined by the local law of the state. Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838.

In the case of Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, it is held that the same rules govern the rights of riparian owners on lakes or other still waters as govern the rights of riparian owners on streams. Mr. Justice Mitchell, in the course of the opinion in that case (at page 197, 52 Minn., and page 1142, 53 N. W.), said:

"The incalculable mischiefs that would follow if the riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self-evident, and have been frequently animadverted on by the courts. These considerations certainly apply to riparian ownership on lakes as well as on streams. * * * The owners of lands bordering on them have often bought with reference to access to the water, which usually constitutes an important element in the value and desirability of the land. If the rule contended for by the appellants is to prevail, it would simply open the door for prowling speculators to step in and acquire title from the state to any relictions produced in the course of time by the recession of the water, and thus deprive the owner of the original shore estate of all riparian rights, including that of access to the water. The endless litigation over the location of the original water lines, and the grievous practical injustice to the owner of the original riparian estate, that would follow, would of themselves be a

sufficient reason for refusing to adopt any such doctrine. That the state would never derive any considerable pecuniary benefit—certainly none that would at all compensate for the attendant evils—we may, in the light of experience, safely assume. Our conclusion, therefore, is that upon both principle and authority, as well as considerations of public policy, the common law is that the same rules as to riparian rights which apply to streams apply also to lakes or other bodies of still water."

See, also, Schurmeier v. Railway Co., 10 Minn. 82 (Gil. 59); Everson v. City of Waseca, 44 Minn. 247, 46 N. W. 405; Lamprey v. Mead, 54 Minn. 290, 55 N. W. 1132.

It is contended by the appellants in this case that the land between the meander line as shown on the plat and the actual waters of the lake is not accretion or reliction, and, therefore, that the authorities above cited have no application, and that the title to the land did not pass by patent; that it is not a question of riparian rights, since the lake was the same at the time of the survey as it is now. We think this can make no difference, as the plat of survey returned to the general and local land offices, and referred to in the patent for identification of the land, exhibited the granted tracts as actually bordering upon the lake. These cases, we think, clearly show that the law of Minnesota in regard to the rights of a riparian owner is the common law, and that the rule applied at common law to nonnavigable streams is applicable as well to inland nonnavigable lakes. The fundamental right of riparian ownership consists in the right of access to the water, and it is in order to make this right available and complete that the doctrine is applied to cases of accretion and reliction; but the same principle underlying those cases, namely, the right of access to the water, is equally applicable to the case at bar.

It is insisted, however, that, "if the appellants be allowed to carry out their instructions for a survey, the most that can be complained of is that a mere technical trespass will be committed, provided the appellees establish their ownership of the locus by appropriate proceedings at law," and that equity will not therefore entertain this application, since the appellees, if they show themselves to be the owners of the premises, and if they suffer any damage, can have adequate relief at law. It is undoubtedly the well-settled rule that where the estate or interest of a party is legal in its nature, and full and complete justice can be done thereby, he will be left to his legal remedy; but the remedy at law must be adequate, and afford full and complete protection, and the relief afforded must be virtually as efficient as that given by a court of equity. If the remedy at law is inadequate for this purpose, then equity will interfere.

The bill in this case alleges, and it is supported by affidavit, that, if the appellants are allowed to proceed with this survey, it will necessarily result in the destruction of much valuable timber, and that it will be a cloud upon plaintiffs' title, and involve them in a multiplicity of suits to establish their right to the land in controversy. While an injunction will not ordinarily be granted to restrain a mere trespass, yet where it is made to appear from the record that the trespass complained of may result in great damage to the estate, or where the mischief is remediless at law, a court of equity will interfere by injunction to prevent an injury for which an action at law will not give

complete redress. The very purpose of the proposed survey by the officers of the government in this case is to establish the right of the government to the land, as public land, the title to which we think, upon the facts stated in the bill, it has already parted with by issuing its patents therefor; and the fact that there is a controversy in relation to it would necessarily, from a business point of view, as every intelligent person knows, be a serious injury to the plaintiffs' title, and tend to greatly depreciate its market value. No one would want to buy property while thus affected, nor loan money upon it as security. It further appears by the bill that a number of people have settled upon portions of the land described in the bill, and it is evident that if this survey is permitted, and the land again thrown open to settlement, as it may be, the plaintiffs, in order to maintain their title, would be involved in a multiplicity of suits to defend it against the claims of parties who had settled thereon.

Again, it is insisted that the defendant Kirwan is the United States surveyor general for the district of Minnesota, and that the defendant Croswell is the deputy surveyor, with whom the contract has been made for the work sought to be enjoined, pursuant to the practice and direction of the general land office. Both stand for and represent the department of the interior. They are subordinate officers of that department, subject to its control; and therefore the power of the court, so far as they are concerned, extends only to acts such as are purely ministerial, and with regard to which nothing like judgment or discretion in the performance of their duties is left to them as officers. It is undoubtedly true that the officers of the several departments of the government cannot be controlled by injunction while acting in a judicial capacity in which their judgments are based upon a consideration of facts, but in this case the action of the land department involved a construction of law which is not subject to the same rule, and such officers may be enjoined from the performance of an unlawful act. Noble v. Railroad Co., 147 U. S. 165, 13 Sup. Ct. 271.

In La Chapelle v. Bubb, 69 Fed. 482, the court said:

"Under ordinary circumstances, this court would not grant an injunction to prevent a trespass; but the defendant Bubb justifies his proposed action on the ground that he is an officer of the United States government, acting only in obedience to orders from his superior officers in the Indian department, and for that reason I deem it entirely proper for this court to restrain him from committing a tort while assuming to act in his official capacity."

We have already said that the government parted with its title to the lands in controversy when it issued its patents therefor; and in Moore v. Robbins, 96 U. S. 530, Mr. Justice Miller, speaking for the court, said:

"With the title passes away all authority or control of the executive department over the land and over the title which it has conveyed. It would be as reasonable to hold that any private owner of land who has conveyed it to another can, of his own volition, recall, cancel, or annul the instrument which he has made and delivered. If fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy. These courts are as open to the United States to use for the cancellation of the deed or reconveyance of the land as to individuals, and, if the government is the party injured, this is the proper course."

And again, in the same case, referring to the power of the secretary of the interior after patent has been issued, at page 534, it is said:

"He is absolutely without authority. If this were not so, the titles derived from the United States, instead of being the safe and assured evidences of ownership which they are generally supposed to be, would be always subject to the fluctuating, and, in many cases, unreliable, action of the land office. No man could buy of the grantee with safety, because he could only convey subject to the right of the officers of the government to annul his title."

In view of these considerations, we are not satisfied that an error was committed in awarding a temporary injunction. It cannot be said, we think, that the injunction was improvidently issued, and the order appealed from is therefore affirmed.