CLOQUET LUMBER CO. v. BURNS.

(Circuit Court of Appeals, Eighth Circuit. July 10, 1913.)

No. 3,883.

**1. REPLEVIN (§ 9*)—POSSESSION OF PLAINTIFF.**

Plaintiff being in the lawful possession of land and of trees standing thereon, the unlawful severance of the trees by defendant did not deprive plaintiff of possession of the logs made therefrom; but when defendant removed them from the land it took them from his possession, as regards his right to maintain replevin therefor.

[Ed. Note.—For other cases, see Replevin, Cent. Dig. §§ 69–82; Dec. Dig. § 9.*]

**2. REPLEVIN (§ 8*)—TITLE—TIMBER ON HOMESTEAD—RIGHTS ACQUIRED AGAINST TRESPASSERS.**

Plaintiff, who had entered on land of the United States for the purpose of acquiring it under the homestead laws, as he had a right, and who had continuously occupied it as such homestead for nine years, when defendant, without right, cut down trees thereon, then had sufficient interest in the logs to enable him to maintain replevin then brought for the logs, and this though the land was unsurveyed, and though he had made no entry in the land office.

[Ed. Note.—For other cases, see Replevin, Cent. Dig. §§ 45–68; Dec. Dig. § 8.*]

**3. REPLEVIN (§ 8*) — OCCUPANCY OF PUBLIC LAND — RIGHTS ACQUIRED BY PLAINTIFF—LOSS OF RIGHTS.**

Plaintiff's right of action—complete when, after he had entered on land of the United States for the purpose of acquiring it under the homestead laws, as he had a right, and had continuously occupied it as such homestead for nine years, defendant, without right, cut down trees thereon—was not defeated by his subsequently acquiring title to the land from the government by the use of scrip, he, when applying to enter the land with scrip, not having abandoned it, but still insisting on his homestead right; the government, under these circumstances, having no right of action for the logs or their value.

[Ed. Note.—For other cases, see Replevin, Cent. Dig. §§ 45–68; Dec. Dig. § 8.*]

**4. REPLEVIN (§ 108*)—DAMAGES—WILLFUL TRESPASS.**

Whether or not defendant was a willful trespasser, as regards the damages which plaintiff is entitled to recover, where, defendant having cut down trees on plaintiff's land, plaintiff brought replevin for the logs, and defendant gave a bond and converted the logs, must be determined by what it knew, or ought to have known, at the time of the cutting, and what it thereafter learned, though before the conversion, is immaterial. Carland, Circuit Judge, dissenting.

[Ed. Note.—For other cases, see Replevin, Cent. Dig. § 422; Dec. Dig. § 108.*]

**5. TRESPASS (§ 45*)—DAMAGES—WILLFUL TRESPASS.**

Though the fact that defendant, in cutting down, without right, trees on plaintiff's land, acted on advice of counsel is not conclusive on the question of willful trespass, as regards the measure of damages, it is competent evidence of good faith.

[Ed. Note.—For other cases, see Trespass, Cent. Dig. §§ 116–122; Dec. Dig. § 45.*]

**6. JURY (§ 34*)—TRIAL BY JURY—INFRINGEMENT OF RIGHT—DIRECTING VERDICT.**

Where, had plaintiff, before the jury retired, waived all damages above a certain amount, the court could have ordered verdict therefor, it could

do so after the jury having retired and failed to agree, plaintiff then made such waiver; this not being a re-examination of a fact tried by a jury, in violation of Const. U. S. Amend. 7. And this is so although one juror refused his consent to the verdict ordered.

[Ed. Note.—For other cases, see Jury, Cent. Dig. § 220; Dec. Dig. § 37.*]

In Error to the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Action by Granville A. Burns against the Cloquet Lumber Company. Judgment for plaintiff, and defendant brings error. Reversed, and new trial ordered.

William B. Phelps, of Duluth, Minn., for plaintiff in error.

Burt F. Lum, of Minneapolis, Minn., and R. R. Briggs, of Duluth, Minn. (John R. Van Derlip and George P. Wilson, both of Minneapolis, Minn., on the brief), for defendant in error.

Before SANBORN and CARLAND, Circuit Judges, and WILLARD, District Judge.

WILLARD, District Judge. This is an action of replevin for 1,500,000 feet of logs. It was brought by Burns, the defendant in error, against the Cloquet Lumber Company, the plaintiff in error. The logs were cut from land around Cedar Island Lake or Ely Lake, in St. Louis county, Minn.

Controversies relating to these lands have at various times appeared in the federal and Minnesota courts. Kirwan v. Murphy, 83 Fed. 275, 28 C. C. A. 348, decided Sept. 27, 1897; Murphy v. Kirwan (C. C.) 103 Fed. 104, decided July 5, 1900; Kirwan v. Murphy, 109 Fed. 354, 48 C. C. A. 399, decided May 20, 1901; Kirwan v. Murphy, 189 U. S. 35, 23 Sup. Ct. 599, 47 L. Ed. 698, decided April 6, 1903; Security Land & Exploration Co. v. Burns, 87 Minn. 97, 91 N. W. 304, 63 L. R. A. 157, 94 Am. St. Rep. 684, decided July 11, 1902; Security Land & Exploration Co. v. Burns, 193 U. S. 167, 24 Sup. Ct. 425, 48 L. Ed. 662, decided Feb. 29, 1904; Murphy v. Tanner, 176 Fed. 537, 100 C. C. A. 125.

The facts relating to the two surveys appear in the reports of these cases, and need not be repeated here. In March, 1892, Burns settled upon what afterwards became lots 11, 12, 13, 14, 19, and 20 of section 4, containing about 135 acres. This land lies between the lake and the Howe meander line. Burns built a house on the land in the spring of 1892, and in the fall of the same year he built and moved into another house on what is now lot 14, in which house he is now living. He has resided upon the land continuously since 1892, and has cleared and cultivated parts of it. His purpose in entering upon the land in 1892 was to secure it as a homestead. In July, 1893, Burns and others applied to have the land surveyed. On July 24, 1896, he applied to the proper land office to enter the land as a homestead, and tendered the fees. On March 24, 1905, the land being still unsurveyed, owing to the litigation above referred to, Burns applied to locate it with Valentine scrip. In his affidavit of that date he

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

stated that he had continuously resided on the land for more than 12 years, and he added:

"That in the month of March, 1892, he was a citizen of the United States over 21 years of age, and qualified and entitled to make homestead entry on its public lands; that in said month he settled upon the lands above described, which were then wholly unoccupied and unappropriated and were unsurveyed, and claimed the same under the homestead laws of the United States, intending to make a homestead entry thereof as soon as the same should be surveyed and open to such entry; that ever since he established such settlement upon said lands he has continuously resided thereon, and has occupied the same exclusively under said claim of homestead right and said intention of making homestead entry; that he is entitled to the exclusive possession of said lands, and every part thereof; that the application to locate said lands which is attached hereto is not made for the purpose of fraudulently obtaining title to saline or mineral land, but with the object of securing said land for agricultural purposes; that affiant's post office address is Eveleth, St. Louis county, Minn."

The land was finally patented to him under his location with Valentine scrip.

The defendant at one time claimed title to the timber on Burns' land by virtue of the purchase of it from the owner of the lots bounded by the Howe meander line, alleging that these lots extended to the lake. After the decision in the United States Supreme Court of February 29, 1904, it abandoned that claim, and now admits that it never had any title to the timber nor any right to cut it. The cutting was done in the winter of 1900 and 1901, and the logs were put in the lake, where they were when the plaintiff commenced this action of replevin on August 1, 1902. The defendant by giving a bond retained possession of the logs, and afterwards converted them to its own use. The court below directed a verdict for the plaintiff for $18,952.38. The case presents three questions: (1) Was Burns entitled, at the time he commenced this action, to maintain it? (2) Was the defendant entitled to have submitted to the jury the question as to whether or not it acted in good faith in cutting and banking the logs? (3) Did the lower court err in instructing the clerk to enter a verdict without the consent of all the jurors, and notwithstanding the refusal of one of them to agree to the verdict?

[1-3] (1) Did Burns, at the time he commenced this action on August 1, 1902, have sufficient interest in the logs to enable him to maintain it against the defendant?

What was his situation at that time? He had entered upon the land for the purpose of acquiring a homestead under the laws of the United States. He had continuously occupied it as such homestead for nine years. There was valuable pine timber standing thereon. The defendant, without any right whatever, entered upon the land, with actual knowledge of Burns' claim, and against his protest cut down and carried off the logs, which in the standing trees were worth more than $6,000. Under these circumstances was Burns bound to remain quiescent, and witness this spoliation, without any right of action against the trespasser? We think not.

He was then in the lawful possession of the land and of the trees standing thereon. The unlawful severance by the defendant of these

trees did not deprive Burns of the possession of the logs made there-from, and when the defendant removed the logs from the land it took them from the possession of Burns.

The fact that the land was unsurveyed is immaterial. Though unsurveyed, Burns had a right to initiate a homestead thereon. St. Paul, Minneapolis & Manitoba Ry. Co. v. Donohue, 210 U. S. 21, 30, 28 Sup. Ct. 600, 52 L. Ed. 941.

That this action can be maintained, although the legal title to the land stood in the United States, we think is settled by the adjudicated cases.

Atherton v. Fowler, 96 U. S. 513, 24 L. Ed. 732, was an action of replevin brought by Page, the plaintiff's intestate, to recover hay cut by the defendants. Two cases brought by Page against Fowler appeared several times in the Supreme Court of California. Page v. Fowler, 28 Cal. 605; Page v. Fowler, 37 Cal. 100; Page v. Fowler, 39 Cal. 412, 2 Am. Rep. 462; Atherton v. Fowler, 46 Cal. 320; Atherton v. Fowler, 46 Cal. 323. From the facts stated in these reports it appears that Vallejo sold a part of the Soscol ranch in 1851 to the plaintiff Page, who in 1860 inclosed parts of it with a substantial fence, and used and occupied the rest for cultivation and pasturage. In the spring of 1862 Vallejo's title under the Mexican grant was finally rejected by the Supreme Court of the United States. On March 3, 1863, Congress passed an act (12 Stat. 808, c. 116) authorizing the Commissioner of the General Land Office to extend the public surveys over the Soscol ranch, and providing that, after the return of the approved plats of the surveys to the district office, bona fide purchasers from Vallejo might enter, according to the lines of the public surveys, at $1.25 per acre, the land so purchased, to the extent to which the same had been reduced to possession. The defendants, claiming the right to pre-empt this land, under the general pre-emption law, entered thereon, and in May, 1863, cut the hay which was the subject of the controversy. This action was commenced on May 25, 1863. *After that date* the public surveys were extended over the lands, and the plaintiff, in accordance with the act of March 3, 1863, applied to the land office to pre-empt the tract purchased from Vallejo. A patent was afterwards granted to him in pursuance of this entry. When the hay in controversy was cut, the defendants knew or should have known that they were mere trespassers on the lands of Page, and had no right to the hay. The Supreme Court of the United States said, in 96 U. S., on page 520, 24 L. Ed. 732:

"It follows that the defendants could not have made any lawful entry on the lands where the hay was cut in this case; that no law existed which gave them any right to make such an entry; that they were mere naked trespassers, making an unwarranted intrusion upon the inclosure of another—an inclosure and occupation of years, on which time and labor and money had been expended—and that, in such a wrongful attempt to seize the fruits of other men's labor, there could be no bona fide claim of right whatever. The instruction of the court that this could be done, founded on an erroneous view of the pre-emption law, was itself erroneous, and the judgment founded on it must be reversed."

There are many points of resemblance between that case and the one at bar. In both the plaintiff was in the lawful possession of the land; in both the trespasser entered upon the land and cut in one case trees and in the other case hay; in both the land was at that time unsurveyed. In both the plaintiff at the time of the trespass had made no entry in the land office, but in that case he had the right to enter the land and to acquire the title thereto under a special law, and in this case he had a right to enter the land and acquire title thereto under the general homestead law. In both the action was replevin, and in each case it was brought before the plaintiff had secured recognition from the government of his right to the land, except as it came from the laws allowing him to acquire title thereto, and in pursuance of which he was in possession. The Supreme Court having held in that case that replevin could be maintained, it necessarily follows that it can be in this case. In Sturr v. Beck, 133 U. S. 541, on page 547, 10 Sup. Ct. 350, on page 352 (33 L. Ed. 761) it appeared that Smith made a homestead filing on certain land in Dakota Territory on March 25, 1879, having settled thereon in March, 1877, that he made final proof on May 10, 1883, and later received a patent for the land. Beck, the defendant, claimed under him. Sturr, the plaintiff, made a homestead entry on adjacent land on May 15, 1880, having settled thereon in June, 1877, made final proof on May 10, 1883, and received a patent for the land thereafter. On May 15, 1880, Sturr entered upon the land of Smith and located a water right, and thereafter constructed a ditch across Smith's land to his (Sturr's) adjacent land. This action was brought by Sturr to enjoin Beck from interfering with his ditch. It is to be noticed that the interference by Sturr with Smith's land was before Smith had made final proof thereon. The court said:

"If, however, Smith obtained a vested right to have the creek flow in its natural channel, by virtue of his homestead entry of March 25, 1879, and possession thereunder, or if his patent took effect as against Sturr by relation as of that date, then it is conceded that Sturr cannot prevail, and the judgment must be affirmed.

"The right of a riparian proprietor of land bordering upon a running stream to the benefit to be derived from the flow of its waters as a natural incident to, or one of the elements of, his estate, and that it cannot be lawfully diverted against his consent, is not denied, nor does the controversy relate to the just and reasonable use as between riparian proprietors. The question raised is whether Smith occupied the position of a riparian proprietor or a prior appropriator, as between himself and Sturr, when the latter undertook to locate his alleged water right. At that time Smith had been in possession for three years, and his homestead entry had been made over a year."

And, again, the court said, on page 551 of 133 U. S., on page 354 of 10 Sup. Ct. (33 L. Ed. 761):

"When, however, the government ceases to be the sole proprietor, the right of the riparian owner attaches, and cannot be subsequently invaded. As the riparian owner has the right to have the water flow ut currere solebat, undiminished except by reasonable consumption of upper proprietors, and no subsequent attempt to take the water only can override the prior appropriation of both land and water, it would seem reasonable that lawful riparian occupancy with intent to appropriate the land should have the same effect."

And the court made the following declaration, on page 552 of 133 U. S., on page 354 of 10 Sup. Ct. (33 L. Ed. 761):

"Thus, under the laws of Congress and the territory, and under the applicable custom, priority of possession gave priority of right. The question is not as to the extent of Smith's interest in the homestead as against the government, but whether as against Sturr his lawful occupancy under settlement and entry was not a prior appropriation which Sturr could not displace. We have no doubt it was, and agree with the brief and comprehensive opinion of the Supreme Court to that effect."

In Shiver v. United States, 159 U. S. 491, on page 499, 16 Sup. Ct. 54, on page 57 (40 L. Ed. 231), the court said:

"While we hold in this case that, as between the United States and the settler, the land is to be deemed the property of the former, at least so far as is necessary to protect it from waste, we do not wish to be understood as expressing an opinion whether, as between the settler and the state, it may not be deemed the property of the settler, and therefore subject to taxation. Carroll v. Safford, 3 How. 441 [11 L. Ed. 671]; Witherspoon v. Duncan, 4 Wall. 210 [18 L. Ed. 339]; Railway Co. v. Prescott, 16 Wall. 603 [21 L. Ed. 373]; Railway Co. v. McShane, 22 Wall. 444 [22 L. Ed. 747]; Wisconsin Central Railroad v. Price County, 133 U. S. 496 [10 Sup. Ct. 341, 33 L. Ed. 687]."

In Red River & Lake of the Woods Ry. Co. v. Sture, 32 Minn. 95, on page 98, 20 N. W. 229, on page 230, it appeared that Sture had resided on the land as a homestead settler since May 1, 1879. The railway company condemned the land in 1882, and therefore before Sture became entitled to a patent. It was held, nevertheless, that he was entitled to damages for the land taken in an amount practically the same as if he were the owner of the land. As to the rights of a homesteader after entry, the court said:

"But a homesteader, after entry, occupies an entirely different position. He has in fact purchased. His entry, which is made by making and filing an affidavit, and paying the sum required by law, is a contract of purchase, which gives him an inchoate title to the land, which is *property*. This is a substantial and vested right, which can only be defeated by his failure to perform the conditions annexed. It is true no certificate or patent can be issued until the expiration of five years from the date of the entry; the United States retaining the legal title to insure performance of these conditions. But the vested right of the settler attaches to the land at the time of his entry, and is liable to be defeated only by his own failure to comply with the requirements of the law. If he complies with these conditions, he becomes invested with full ownership and the absolute right to a patent, which, when issued, relates back to the time of the entry, and, under the act of May 14, 1880 (21 U. S. St. 140, c. 89 [U. S. Comp. St. 1901, p. 1393; Supp. to U. S. Rev. St. 525]), his right under the entry relates back to the date of the settlement. Until forfeited by his own failure to perform the conditions of his purchase, this right of property acquired by his entry must prevail, not only against individuals, but against the government itself. This is the view expressed in an opinion of the Attorney General of the United States, addressed to the Secretary of War, in July, 1881. See 1 Copp, Pub. Land L. 387."

In Peyton v. Desmond, 129 Fed. 1, on page 12, 63 C. C. A. 651, on page 662, this court said:

"It conclusively appears, as before shown, that the timber was severed from the land after the initiation and during the maintenance of the plaintiff's homestead claim; in other words, while he had a conditional or inchoate right to the land, which was capable of perfection through compliance with the homestead law, and which in due course ripened into a full, legal, and equitable title before the commencement of this action. This conditional or

inchoate right included an exclusive right to the possession so long as the plaintiff should comply in good faith with the requirements of the law controlling homestead claims, and included a further right to earn and receive the title. This right to the possession and to earn and receive the title extended to everything which was part of the land—timber as well as soil. The severance of the timber from the soil was a violation or infraction of the plaintiff's right to the possession, and of his right to earn and receive the title. It was an injury to both. It may be that the conditional or inchoate right of a homestead claimant is subject to a power in Congress to terminate it in whole or in part—as to the land or only as to the timber—at any time before it is perfected into a vested equitable estate by full compliance with the requirements of the law; but it is not terminable or subject to impairment by third persons."

In Shea v. Cloquet Lumber Company, 97 Minn. 41, on page 43, 105 N. W. 552, on page 553, the Supreme Court of Minnesota, in speaking of the rights of Shea, a neighbor of Burns, to the timber cut by it under the same circumstances under which it cut the timber in question in this case, said:

"The next assignment of error is that the court erred in refusing to give to the jury the defendants' first request, which was this:

"Timber growing on unsurveyed government lands belongs to the United States, and a squatter on such lands has no interest in or title to such growing timber.

"As against the United States it is true that a squatter has no title to or interest in the land. The evidence, however, tended to show that the plaintiff settled upon the land some nine years before his arrest; that he made application to enter the land under the homestead laws, which was refused; that 'plaintiff believed in good faith that he was entitled at least to the possession of the land, that he would ultimately acquire it from the government, and that he was the owner of the timber growing thereon.' See [Shea v. Cloquet Lumber Co.] 92 Minn. 348, 100 N. W. 111 [1 Ann. Cas. 930]. This evidence tended to show that as against a trespasser the plaintiff had an inchoate interest in the timber growing on the land he was so in possession of. Hastay v. Bonness, 84 Minn. 120, 86 N. W. 896. In view of this evidence, the requested instruction, if given, would have been misleading, for the reason that the jury might infer therefrom that the plaintiff had no right as against trespassers to protect the timber growing on the land in his possession. The court did not err in refusing to give the instruction."

Plaintiff's right of action was complete in August, 1902, and nothing has happened since that time to defeat it. The United States has conveyed the land to him. It seems to be admitted by the defendant that if this conveyance had been made by the government under the homestead laws the plaintiff would prevail in this action. But it says that, because Burns, acting under the advice of counsel, instead of taking the land under his homestead claim, secured title from the government by the use of Valentine scrip, he has lost his right of action for the value of this timber. To this we cannot agree. The affidavit made by him when he applied to enter the land with Valentine scrip shows that he had not abandoned it, but was then insisting upon his homestead right. The government, instead of giving the land to Burns as it was bound to do, secured what amounted to a cash payment for it. So far from being damaged by the change in the method of acquisition, it benefited by it.

In Ard v. Brandon, 156 U. S. 537, on page 541, 15 Sup. Ct. 406, on page 408 (39 L. Ed. 524), it appeared that Ard entered uopn the land

in question for the purpose of securing it as a homestead. He made application to enter it as a homestead, which application was denied. Under the advice of the local officers he entered it under the pre-emption law. His application under that law was rejected. He was denied the right to change his entry to a homestead entry; but he continued to reside upon the land, which was afterwards patented by the government to the grantor of Brandon, who brought this action in ejectment. It was held that Ard was entitled to the land. The court in this case said:

"But we are of the opinion that the testimony shows a right anterior to his, pre-emption entry—a right of which he was deprived by the wrongful acts of the local land officer, and which he did not forfeit or lose by virtue of his subsequent efforts to pre-empt the land."

And, again, on page 543 of 156 U. S., on page 409 of 15 Sup. Ct. (39 L. Ed. 524):

"Such wrongful rejection did not operate to deprive defendant of his equitable rights, nor did he forfeit or lose those rights because, after this wrongful rejection, he followed the advice of the register, and sought in another way to acquire title to the lands. The law deals tenderly with one who, in good faith, goes upon the public lands, with a view of making a home thereon. If he does all that the statute prescribes as the condition of acquiring rights, the law protects him in those rights, and does not make their continued existence depend alone upon the question whether or no he takes an appeal from an adverse decision of the officers charged with the duty of acting upon his application."

And, again, on page 544 of 156 U. S., on page 409 of 15 Sup. Ct. (39 L. Ed. 524):

"Doubtless the error could have been corrected by an appeal, and perhaps that would have been the better way; but when, instead of pursuing that remedy, he is persuaded by the local land officer that he can accomplish that which he desires in another way—a way that to him seems simpler and easier—it would be putting too much of rigor and technicality into a remedial and beneficial statute like the homestead law to hold that the equitable rights which he had acquired by his application were absolutely lost."

The case at bar is much stronger than the case of Ard v. Brandon, for in that case Ard never acquired a patent from the government, but another did; while in this case Burns secured title from the government, but in another way than by his homestead claim.

In Preston v. Cloquet Tie & Post Co., 114 Minn. 398, 131 N. W. 474, it appeared that the plaintiff applied to enter the land as a homestead on July 12, 1902. This application for no fault of his was rejected, and on October 3, 1907, he filed a new homestead entry on the same land. A final certificate was afterwards issued to him. Prior to 1903, Randall, the grantor of the defendant, entered upon the land and cut the standing timber thereon. It was held that Preston was entitled to recover the value of the timber thus cut and removed. It will be noticed that it was cut prior to the homestead entry made in 1907, under which Preston acquired his title.

The court said, on page 401 of 114 Minn., on page 475 of 131 N. W.:

"The first and second alleged reasons here urged by the defendant why the facts do not sustain the judgment are to the effect that they show that the United States, and not the plaintiff, was the owner of the timber claimed to

have been converted, and, further, that the filing of the second application was a waiver of all rights, if any, acquired under the first application, and that the final certificate and patent relate back only to the second application. It is to be noted in this connection that the plaintiff was in the actual possession of the timber, which is the subject-matter of this action, as it was severed from the soil and banked on the land of which he was in the exclusive possession, and, further, that the defendant is a stranger to the title of both the timber and the land whereon it was cut and piled. Such possession was prima facie sufficient to enable the plaintiff to maintain this action against the defendant, who took and carried away the timber from his possession without any lawful right thereto. Stitt v. Namakan Lumber Co., 95 Minn. 91, 103 N. W. 707.

"It is true, however, that the legal title to the land was in the United States when the timber was cut, and also when the defendant carried it away; but it is clear, from the facts found by the trial court, that the plaintiff's possession of the land, from September, 1902, down to the time when the patent therefor to him was ordered to be issued, and the granting of the final certificate, was continuous and exclusive under his homestead entry. The fact that the land department erroneously rejected his first application, evidently for the reason that the land was claimed by the Northern Pacific Railway Company, did not affect his substantial rights and equities as against the defendant, a stranger to the title. He settled upon the land, claiming it as a homestead under his first application, which was in fact and law valid, although by reason of the mistake of the land department he was obliged to make a second application. He did all that he could do to protect his rights in the land and the growing timber thereon, and they are not affected by the mistake of the land officers. Roy v. Duluth & I. R. Ry. Co., 69 Minn. 547, 72 N. W. 794."

In Potter v. United States, 122 Fed. 49, on page 53, 58 C. C. A. 231, on page 235, this court said:

"It is contended, however, that the commutation of Byerla's homestead entry to a cash entry, the sale of the land to him thereunder by the government, the issue of the final certificate, and the acceptance by the United States of the purchase price of the property in February, 1896, estopped the government from maintaining an action against the defendants for the timber taken from the land by Byerla or for its value, and that upon this ground the defendants were entitled to a peremptory instruction in their favor. The position would be sound if the sale of the land by the United States and its issue of the final certificate had not been induced by fraud, or if, by act or acquiescence, the government had condoned or waived that defect. The acceptance from the purchaser by the United States, or by any other vendee, of the price of the land of which he has been in possession under an offer or contract of sale estops the vendor from recovering damages of the vendee or of his grantee for timber or ore taken from the land by them during the pendency of the offer or contract. Teller v. United States, 54 C. C. A. 349, 117 Fed. 577; United States v. Ball (C. C.) 31 Fed. 667; United States v. Freyberg (C. C.) 32 Fed. 195."

In United States v. Ellis (C. C.) 122 Fed. 1016, the facts were similar to those in the case at bar, with this difference, that in that case the United States attempted to recover the value of the timber from the grantee of the homestead settler.

The court said, on page 1017 of 122 Fed.:

"The timber taken from parcel 1 was purchased in good faith from J. B. Stoddard, who was at the time a settler on the land as a homesteader. Thereafter, and before a full compliance with the homestead laws, so as to entitle him to title, Stoddard relinquished his homestead for the purpose of acquiring title by entry with forest reserve scrip, and simultaneously with his relinquishment he did make such entry, and acquired title. Had he completed his title under the homestead laws, neither he nor his vendee would have been

liable, under the rule of United States v. Ball, for timber cut and sold in the meantime. Does it alter the case that he abandoned one method, and acquired title by another? It is clear that, as to the willfulness of what was done, it does not do so. Upon principle, it makes no difference whether a person who goes into possession of real property under a contract of purchase acquires his title under such contract, or under a new and substituted contract. There was no abandonment of the entry, or relinquishment of the purpose for which it was made. The substituted method of acquiring title was in operation from the moment the first method was relinquished. The possession was at all times lawful. There was no damage to the government in the substituted contract. It may be open to question whether the title acquired under the scrip purchase can be said to relate back to the homestead entry; but, with or without such relation, the consequence is the same. There was no trespass in either case. The reason why a person who goes into possession of real property under a contract of purchase, and abandons or fails to comply with his contract, is liable in trespass for the profits of the land, or waste committed, is because the vendor has the property thrown back on his hands, impaired in value. And this event must happen before a right of action arises. There has been no moment of time when the government has been damaged. It has been threatened with damage in the risk mentioned, and it would have had good right to an injunction restraining the act which threatened its interests. But its interests have not been impaired, and without this, or damage or injury, it cannot recover as for damage or injury."

Under these circumstances, the fact which appears in evidence that the United States also is suing the defendant for the value of this timber is no defense. That action cannot be maintained by the government.

From the letter presented in evidence written by the government counsel in charge of that suit, it is apparent that such is their opinion, in case the defendant pays Burns for the timber.

[4, 5] (2) The court instructed the jury that the defendant was a willful trespasser, and that the plaintiff was entitled to recover as damages the value of the logs in the lake. In this we think that there was error. In what we here say we do not at all mean to indicate that the evidence showed that the defendant was not a willful trespasser. We hold only that the question whether it was or not should have been left to the jury to decide.

Whether the defendant was or was not a willful trespasser must be determined by what it knew or ought to have known at the time of the cutting, which was in the winter of 1900 and 1901. What it learned after that is immaterial. At that time it had been decided by Judge Morris in the state district court that the defendant's rights went to the Howe line only, and that it had no right to cut on the land of Burns.

This decision was made July 13, 1896, and Hornby, the defendant's manager, then knew it. The action being in ejectment, a second trial was demanded and granted in accordance with the practice of Minnesota, and the judgment entered on this decision was vacated. Some months prior to September, 1897, Judge Lochren in the United States Circuit Court upon a motion for temporary injunction held, contrary to the decision of Judge Morris, that the title of the owner of the lots bounded by the Howe line did extend to the lake, and that therefore the defendant under its timber deed had the right to cut on Burns' land. This decision was affirmed by this court on September 27, 1897.

207 F.—4

and it was expressly declared in that decision that the grantor of the defendant, and not Burns, was the owner of this land. Kirwan v. Murphy, 83 Fed. 275, 28 C. C. A. 348. At the final hearing in the Circuit Court Judge Lochren again made the same ruling on July 5, 1900. 103 Fed. 104. Hornby knew of all these decisions as they were made, and they were all made before the cutting commenced. The next decision agreeing with that of Judge Morris was made by Judge Cant, in the state district court, who held that the defendant's grantor took only to the Howe line; but this decision was not rendered until September 4, 1901, after the cutting had been done. The judgment in that case was afterwards affirmed by the Supreme Court of the state of Minnesota, and by the Supreme Court of the United States. Hornby testified that he was kept informed by his counsel of the progress of the litigation. He knew that this court had decided that he had the right to cut this timber. If that decision had been right, the defendant would have prevailed in this action. It was the highest court that had passed upon the question at the time of the cutting. Within the decisions of this court as to what is a willful trespass in this class of cases, that question should in this case have been left to the jury. Central Coal & Coke Co. v. Penny, 173 Fed. 340, 97 C. C. A. 597; Liberty-Bell Gold Mining Co. v. Smuggler-Union Mining Co. (C. C. A.) 203 Fed. 795.

In view of another trial of this case, we will say that while the advice of counsel is no defense, and is not conclusive upon the question of willful trespass, yet it is competent evidence upon the question of good faith, and it would be error to exclude it.

[6] (3) The only question left to the jury when they retired was as to the value of the logs, and they were instructed that they must return a verdict for the plaintiff for some amount between $8 and $11 a thousand. After being out two days, the jury reported that they could not agree. The plaintiff thereupon waived all damages above $8 a thou-sand, and a verdict for that amount was directed by the court and signed by a juror. Upon being asked by the clerk of the court if that was their verdict, 11 of the jurors responded that it was, and one juror responded that it was not. Thereupon the court ordered the clerk to enter and record the verdict as signed. In this there was no error. If, before the jury had retired at all, the plaintiff had waived all damages above $8, the court could then have ordered such a verdict. Slocum v. New York Life Ins. Co., April 21, 1913, 228 U. S. 364, 33 Sup. Ct. 523, 57 L. Ed. 879, and the objection made by a single juror could not have prevented it. Cahill v. C., M. & St. P., 74 Fed. 285, 20 C. C. A. 184.

When the court did direct the entry of judgment, the jury had not passed upon any questions submitted to them. Ordering a verdict after the jury has deliberated and has been unable to agree is not a reexamination of a fact tried by a jury, in violation of the seventh amendment of the United States Constitution.

However, for the error in taking from the jury the question of good faith, the judgment must be and it is reversed, and a new trial ordered.

CARLAND, Circuit Judge. I dissent from so much of the opinion as holds that it was error not to submit to the jury the question as to whether the lumber company cut and converted the logs to its own use in good faith. The claim that the ravishment of virgin pine by the lumber company under the facts in this case was in good faith strikes one as so incongruous as to immediately challenge attention.

What constitutes good faith? It has been defined as follows: Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of law, together with absence of all information and belief of facts which would render the transaction unconscientious. The facts as they appear in the record, and they are undisputed, fall very far short of entitling the lumber company to the protection of the grateful shade of good faith. I cannot agree that whether or not the lumber company was a willful trespasser must be determined by what it knew or ought to have known at the time of the cutting. The logs were actually taken from the lake about four years after they were cut, and long after there had ceased to be any question whatever as to the validity of the lumber company's claim to the same. The undisputed testimony has convinced me that the lumber company was determined to take the timber at all hazards, regardless of the rights of Burns or any one else. This being so, there is no room for the plea of good faith.

The judgment, in my opinion, should be affirmed.