## STRAUS et al. v. VICTOR TALKING MACH. CO. et al.

(Circuit Court of Appeals, Second Circuit. February 4, 1924.)

No. 49.

1. **Monopolies ⊚⇒28—Attorney's fees in defending civil action held not recoverable under Sherman or Clayton Acts.**

Where the questions litigated were so debatable that the decision of the Circuit Court of Appeals was reversed by the Supreme Court, the suit could not be said to be a step in pursuance of an illegal combination, entitling successful defendant to "threefold damages by him sustained and the costs of suit, including a reasonable attorney's fee," under Sherman Act, § 7 (Comp. St. § 8829), and Clayton Act, § 4 (Comp. St. § 8835d), for "damages by him sustained," as construed when the acts were passed, does not include attorney's fees in defending civil actions, since free access to the courts must neither be denied nor penalized.

2. **Monopolies ⊚⇒28—Evidence held to show plaintiffs could have obtained goods if market had been open.**

In an action under Sherman Act, § 7 (Comp. St. § 8829), and Clayton Act, § 4 (Comp. St. § 8835d), for threefold damages to plaintiffs' business, evidence *held* sufficient to show that there was an ample supply of the goods, and that plaintiffs could have obtained goods to supply their business requirements if the market had been open.

3. **Damages ⊚⇒6—Difficulty of ascertainment does not prevent recovery of damages.**

Courts endeavor to award damages where a wrong has been done, and difficulty of ascertainment cannot prevent right of recovery.

4. **Monopolies ⊚⇒28—Evidence as to whether plaintiffs could have purchased in open market held not speculative.**

In an action under Sherman Act, § 7 (Comp. St. § 8829), and Clayton Act, § 4 (Comp. St. § 8835d), to recover threefold damages to plaintiffs' business, *held*, that it could not be said that the jury was left to speculate *as to* whether plaintiffs could have purchased the goods in the free market, because some of defendants' distributors testified that they would not have sold to plaintiffs, and because plaintiffs engaged in a cut price competition against other retailers.

5. **Monopolies ⊚⇒28—Retailers held entitled to recover difference between reasonable price and price they were compelled to pay.**

Retail dealers, who were compelled to pay more than the reasonable price set by defendants themselves because of an illegal combination of manufacturer and distributors of phonographs, *held* entitled to recover the difference between the established reasonable price to retailers and the prices they were compelled to pay because of the restricted market, if they acted reasonably in making such payments.

6. **Monopolies ⊚⇒17(2)—Wholesaler's refusal to sell to retailer as part of combination or conspiracy held illegal.**

An individual wholesaler may refuse to sell to a retailer, but such refusal cannot be legally exercised, if it is a part of an illegal conspiracy or combination.

---

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Monopolies ⊗⇒28—Instruction as to retailers' recovery of increased cost of goods due to combination held correct and sufficiently favorable to defendants.**

An instruction that if retailers, in making special purchases of phonographs and supplies, would have had to go to other than defendant distributors and pay retail prices, even if the defendants' licensing system had not been in operation, the jury could not award the increased costs in any such transaction, *held* correct and sufficiently favorable to defendants.

**8. Evidence ⊗⇒354(13)—Original memoranda of transactions held properly admitted, where persons having personal knowledge could not be produced.**

In proving amounts paid for goods by a large department store, where the persons who had actually made the purchases were no longer employed, *held*, that the court properly admitted the memoranda or invoices as proof of the amounts paid.

**9. Monopolies ⊗⇒28—Reasonable fees for New York attorneys held properly measured by New York standards.**

In making allowance for attorney's fees 'in action to recover threefold damages for violation of Sherman Act, § 7 (Comp. St. § 8829), and Clayton Act, § 4 (Comp. St. § 8835d), a reasonable attorney's fee in New York for New York attorneys was properly measured by the New York standard of fees ordinarily charged.

**10. Evidence ⊗⇒18—Common knowledge that rentals in business sections occupied by attorneys and compensation of attorneys' employees have substantially advanced.**

It is common knowledge that there has been a very great rise in rentals in business sections where attorneys must ordinarily have their offices, as well as a substantial advance in the compensation to their employees.

**11. Attorney and client ⊗⇒140—Elements to be considered in determining reasonable attorney's fees stated.**

In determining what is a reasonable attorney's fee, some of the elements to be considered are character of services rendered, the manner in which rendered, the time occupied, the result attained, and the responsibility resting on counsel.

**12. Monopolies ⊗⇒28—Allowance of $35,000 in action involving much preparation and protracted trial held well within court's discretion.**

In an action to recover damages for violation of Sherman Act, § 7 (Comp. St. § 8829), and Clayton Act, § 4 (Comp. St. § 8835d), which required a great amount of preparation and involved a protracted trial, an allowance of $35,000 for attorneys' fees *held* well within the judicial discretion; but, in view of the fact that an allowance of treble counsel fees in defending a previous action brought by present defendant against plaintiffs was eliminated on appeal, the allowance should be reduced to $30,000.

**13. Monopolies ⊗⇒28—Stenographer's fees held not taxable as "costs of suit" in action at law under Sherman and Clayton Acts.**

Stenographer's fees and other expenditures necessarily incident to the prosecution of the action, though taxable under Equity Rule, § 50, *held* not taxable as "costs of suit" in an action at law under Sherman Act, § 7 (Comp. St. § 8829), and Clayton Act, § 4 (Comp. St. § 8835d).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Costs of Suit.]

**14. Appeal and error ⊗⇒1140(4)—Judgment erroneous in amount only corrected by Circuit Court of Appeals.**

Where the sole error in the judgment could be corrected by computation, the Circuit Court of Appeals could direct a remittitur.

Manton, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the Southern District of New York.

Action by Jesse Isidor Straus and others, copartners trading under the firm name and style of R. H. Macy & Co., against the Victor Talking Machine Company and others. Judgment for plaintiffs, and both parties bring error. Affirmed, on condition of remittitur.

Cross-writs of error to a judgment of the District Court for the Southern District of New York in favor of plaintiffs for $184,836.68. Defendants' writ is to review the judgment in favor of plaintiffs. Plaintiffs' writ is to review so much of the final order, dated May 19, 1921, as denied recovery to plaintiffs in excess of taxable costs for expenditures incurred in the prosecution of the cause including stenographer's charge for minutes of the trial. The action was brought under section 7 of the Sherman Act (Act Cong., July 2, 1890, 26 Stat. 210 [Comp. St. § 8829]) and section 4 of the Clayton Act (Act Cong. Oct. 15, 1914, 38 Stat. 731 [Comp. St. § 8835d]), to recover three-fold damages alleged to have been sustained by the plaintiffs in their business or property as the result of alleged violations of these statutes.[1]

The record contains 6,528 and the briefs 567 printed pages, and thus it is not practicable to recite many facts relating to details. It will be necessary to state only the essential facts which expose the questions of law involved. Some of these questions seem to be novel as applied to an action of this character and deserve careful and somewhat extended consideration. The main facts will be first stated, and such other facts added in the course of the opinion as may be necessary in connection with a discussion of questions of law.

Plaintiffs during the period in question owned and operated a department store at Broadway and Thirty-Fourth street, New York City, and will be referred to as plaintiffs or Macy's. Defendant, Victor Talking Machine Company, manufactured under its United States letters patent sound-reproducing machines, records, and supplies at its factory in Camden, N. J., and will be referred to as Victor Company. The other defendants are New York jobbers or distributors of Victor goods and, except Blout, are officers of corporate defendants.

Wise & Seligsberg, of New York City (Leon Lauterstein, Isaac Lande, and Milton Winn, all of New York City, of counsel), for plaintiffs.

Rounds, Schurman, & Dwight, of New York City (George W. Schurman, of New York City, John D. Myers, of Camden, N. J., William H. Griffin, of New York City, Louis B. Le Duc, of Camden, N. J., and Allen S. Hubbard, of Pelham Manor, N. Y., of counsel), for defendant Victor Co.

Gilbert H. Montague, of New York City (Joseph W. Goodwin, of New York City, of counsel), for defendants other than Victor Co.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). Prior to August 1, 1913, the Victor Company marketed its patented products throughout the United States through a system of sales contracts with its distributors and dealers by which it regulated the prices at which these products were resold to dealers and by dealers to the public and also prescribed the persons who were entitled to be established as dealers and to receive dealer's discounts. Included in the 128 departments

[1] Sherman Act, section 7: "Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover

into which Macy's was divided was the music department, known as No. 83, in which, with other articles, the goods of Victor Company were sold.

Prior to May 1, 1914, the managers of this department signed various sales agreements with Victor distributors and thus plaintiffs were a part of the then system of Victor Company. In accordance with that system, Macy's had executed dealer's contracts with various distributors in New York City, who are defendants in this action. Under these contracts or sales agreements, Macy's had the right to purchase from distributors named therein, Victor goods at a discount of 40 and .10 per cent. from the list price for such products established by Victor Company and an additional 2 per cent. was allowed for cash payments within 10 days, and every dealer was obligated to sell to the public at the list price fixed by Victor Company.

On August 1, 1913, Victor Company announced to its distributors and dealers the adoption of a new method of marketing its products under a so-called license system. A circular letter issued by Victor Company, announcing this new plan, was received by plaintiffs on August 1, 1913. By this system Victor Company attempted to retain title to all patented machines and records thereafter shipped to distributors and to license the use of them for the term of its patent having the longest time to run. The circular referred to the decision of the Supreme Court in Bauer & Cie. v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150, decided May 26, 1913, and pointed out what Victor Company urged as to the commercial advantages of such a system.

It was provided in this "license agreement" that licensed dealers were by its terms permitted to use the Victor instrument only for demonstrating purposes and were empowered to assign the right to the public "upon payment of the full list royalty or license fee" as fixed by Victor Company from time to time, and it was also provided that no "license" should be assigned by distributors "to a dealer at less than the dealer's license royalty, or by any dealer to a user or any other party at less than the full list royalty," and the distributors could only license to a dealer approved by Victor Company. Other features of the license agreement were in aid of its main purpose. Notices containing the restrictions, supra, were attached to the Victor instruments. By October 1, 1913, every distributor had fallen in line and had signed the license agreement. Various distributors, including certain of the defendants, urged plaintiffs to sign the new agreement, and so also did Victor Company.

On May 1, 1914, Victor Company sent plaintiffs a letter informing them that their prior contracts with Victor Company had been annulled,

---

threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

Clayton Act, section 4: "Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any District Court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

and stating that, if the new agreements were signed and returned by May 4, 1914, Victor Company would accept them, but, if not, then—

"No Victor patented goods, as now disposed of under our license agreements, will be furnished ,you by this company, either directly or indirectly at dealers' discounts."

Plaintiffs ignored the ultimatum and did not sign. On May 4, 1914, Victor Company notified the trade—i. e., the distributors—that plaintiffs had not signed, and that "they are not, after this date, entitled to receive any Victor patented goods at dealers' discounts." Thereafter plaintiffs were unable to purchase from Victor distributors. The trade war became intense and bitter. No distributor, even if willing, could sell Macy's at less than full retail price without himself incurring the danger of being eliminated as a distributor.

Plaintiff, in October, 1914, entered upon a cut-price campaign for the sale of Victor patented goods. The situation thus was that on one side were the Victor Company and its distributors operating under a restrictive license system; and, on the other, plaintiffs, outside of this system, getting the goods where and when they could and fighting their opponents with the trade weapon of less cost to the public.

In these circumstances, Victor Company in November, 1914, filed a bill in equity in the District Court for the Southern District of New York to restrain Macy's from infringing its letters patent. Macy's then moved to dismiss this bill upon three grounds: (1) That the court was without jurisdiction; (2) that the facts alleged in the bill were insufficient to constitute a valid cause of action in equity; and (3) that it appeared from the face of the bill that the system of marketing Victor goods was in violation of the Sherman Law and Clayton Act.

Judge Augustus N. Hand granted the motion upon the second ground, but denied it on the first and third grounds, stating, inter alia: "I think that no provision of the Sherman Act or Clayton Act affects the matters at issue." This court affirmed the decree with leave to Victor Company to amend. 225 Fed. 535, 140 C. C. A. 519.

Victor Company amended its complaint, and plaintiffs moved to dismiss upon the same grounds as previously. This motion was granted by Judge Hough upon the second ground mentioned, supra. On appeal, this court unanimously sustained the amended complaint and reversed the decree below, giving its reasons in an opinion per Lacombe, C. J., dated January 11, 1916. 230 Fed. 449, 144 C. C. A. 591.

On April 9, 1917, the Supreme Court decided Motion Picture Patents Co. v. Universal Film Co., 243 U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959. In that case, Justices McKenna, Holmes, and Van Devanter dissented. On the same day the Supreme Court reversed Straus v. Victor, 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955, Justices McKenna, Holmes and Van De Vanter dissenting, and held that the license agreements were illegal. In the Motion Pictures Patents Co. Case, the court frankly and flatly discarded Henry v. Dick, 224 U S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880.

On May 29, 1917, Victor Company announced to distributors and dealers that the license agreements were canceled and that the system

of distribution thereunder was discontinued. On September 7, 1917, the present action was brought and the trial of the case began on January 11, 1921, and on March 25, 1921, the jury brought in its verdict. The cause was ably tried by equipped counsel, and Judge Mack, before whom the trial took place, dealt with the many difficult questions so carefully and clearly that out of this necessarily voluminous record the master facts which give rise to the controversial questions plainly appear.

The court instructed the jury to make separate findings in respect of the subject-matter of damages. As the case developed, the figures were susceptible of substantially accurate statement. It was shown without dispute that plaintiffs had paid counsel fees and disbursements amounting to $15,804 as their expenses in defending the so-called infringement suit of Victor v. Straus, supra. The reasonableness of these fees was not contested. The following figures were submitted to the jury as indicating plaintiff's claim for damages as finally presented, and as affected by defendants' contentions. The details will be explained, infra.

| | |
|---|---:|
| In respect of purchases, through joint purchasing office to May 29, 1917.... | $26,193.58 |
| In respect of purchases made by the comparison and receiving departments to May 29, 1917 | 14,402.26 |
| Loss on discounts after May 29, 1917 | 7,193.23 |
| Counsel fees, supra | 15,804.00 |
| | $63,593.07 |

The jury returned the following verdict:

| | |
|---|---:|
| After May 29, 1917 | Nothing |
| Comparison and receiving purchases | $7,701.13 |
| Attorney's fees | 15,804.00 |
| Before May 29, 1917 | 26,193.58 |
| | $49,698.71 |

The verdict pursuant to the statute was trebled, and the court fixed $35,000 as a reasonable counsel fee. Thus it was that, after adding taxable costs, the judgment amounted to $184,836.68. All claims for damage after May 29, 1917, being out of the case, the controverted items of damages are the three covered by the jury's verdict.

### 1. Attorney's Fees.

[1] The trebled amount of this item is $47,412. The court admitted evidence as to these fees and charged the jury on the theory that, if the suit of Victor v. Straus, supra—

"was a step taken in pursuance of the combination that then existed, for the purpose of making that combination stronger, or to scare people, or anything of that kind, if it was a step in the combination, and not the independent act of the Victor people in pursuance of their patent rights—then they would be liable for the damage suffered, and it would not make any difference whether or not they believed that their combination was legal, or whether they thought it illegal. * * * If the patent suit was brought simply as a step in the carrying out of that combination (meaning the illegal combination), then they are liable, and the other defendants, who were a part of

that combination, are liable, for the damages caused in that step in carrying out the combination."

The argument is that the submission to the jury and its finding were supported by (1) the fact that, although plaintiffs refused to sign the license agreement in May, 1914, and openly dealt in Victor goods thereafter, no suit was brought against them until November, 1914; (2) that it was the object of the suit brought by Victor Company to intimidate plaintiffs; (3) that circulars issued by Victor Company contained warnings as to price maintenance and its use of the suit to accomplish that purpose; (4) that the distributors aided Victor Company in furnishing proofs and affidavits directed to the point of price maintenance; (5) that the allegations in Victor v. Straus did not charge infringement in the manner usual to infringement suits, but were directed to price or royalty charge; (6) that the officers of Victor Company did not testify, and hence were not subjected to cross-examination as to what they regarded as the real object of the suit. But all this is no evidence in the sense of the law that the bringing of a suit to establish rights was "a step in pursuance of the combination."

What the court held, and what plaintiffs now contend, is, when simply stated, that resort to the courts, if unsuccessful, may be a step in violation of the statutes here concerned, and that a jury may so find, and award as part of the damage the fees of the attorneys of the successful party. If Victor Company had been successful, plaintiffs would not be here; for, in that event, the license agreements would have been held lawful. We think this mere statement displays the error in this regard.

The sections of the statutes (noted in the margin)[2] speak of the "damages by him sustained." "Damages" must be construed as that term was known to the law when these acts were passed. Kepner v. United States, 195 U. S. 100, 124, 24 Sup. Ct. 797, 49 L. Ed. 114, 1 Ann. Cas. 655. As said by the Supreme Court in Pennsylvania Railroad Company v. International Coal Company, 230 U. S. 184, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315, when construing section 8 of the Interstate Commerce Act (Comp. St. § 8572):

"The statute gives a right of action for *damages* to the *injured* party, and by the use of these legal terms clearly indicated that the damages recoverable were those known to the law and intended as compensation for the injury sustained."

In various classes of cases, "damages" have been held not to include counsel fees incurred in defending civil actions. Oelrichs v. Spain, 15 Wall. 211, 21 L. Ed. 43; Flanders v. Tweed, 15 Wall. 450, 21 L. Ed. 203; Tullock v. Mulvane, 184 U. S. 497, 22 Sup. Ct. 372, 46 L. Ed. 657; Missouri, Kansas, etc., Railway Co. v. Elliott, 184 U. S. 530, 22 Sup. Ct. 446, 46 L. Ed. 673.

We think the question here is not one as to "probable cause," and much that is argued by both sides upon that point may be passed by. Whether an action will lie in the federal courts to recover damages for the prosecution of a civil action or suit instituted maliciously and

[2] See note on page 793, supra.

without probable cause has not yet invited determination by the Supreme Court, although other courts have declined to entertain such actions. Tamblyn v. Johnston, 126 Fed. 267, 62 C. C. A. 601; Ray v. Law, 1 Pet. C. C. 207, Fed. Cas. No. 11,592; Potts v. Imlay, 4 N. J. Law, 330, 7 Am. Dec. 603; Quartz Hill Gold Mining Co. v. Eyre, L. R. 11, Q. B. 674. Per contra, in certain circumstances and with certain limitations: Willard v. Holmes, Booth & Haydens, 142 N. Y. 492, 496, 37 N. E. 480; Ferguson v. Arnow, 142 N. Y. 580, 37 N. E. 626; Burt v. Smith, 181 N. Y. 1, 5, 73 N. E. 495, 2 Ann. Cas. 576; Wade v. National Bank of Commerce (C. C.) 114 Fed. 377; Wilkinson v. Goodfellow-Brooks Shoe Co. (C. C.) 141 Fed. 218.

We think the question goes deeper, and we place our decision on a ground more fundamental. Free access to the courts must neither be denied nor penalized. Of this principle, the case at bar is a perfect illustration. When the suit of Victor v. Straus was brought, the most which can be said against Victor Company is that the questions litigated were debatable. The court of last resort to which an appeal could be taken without permission by way of certiorari had declared in 230 Fed. 449, 144 C. C. A. 591, that Victor Company was right. The Supreme Court on certiorari reversed on the same day upon which it announced repudiation of Henry v. Dick, supra. In such circumstances, to say that a suit brought to determine rights may be a part of a scheme to violate statute law, and, if so, that the suitor may be subject to respond in damages, is to announce that he who seeks the judgment of the courts does so at his peril.

In Missouri Pacific Railway Company v. Larabee, 234 U. S. 459, 34 Sup. Ct. 979, 58 L. Ed. 1398, the question arose as to whether the Supreme Court of Kansas was justified in applying to a Kansas statute the Kansas rule, which allowed the recovery of all counsel fees, or whether the Kansas court should have refrained from applying this rule in respect of that part of the counsel fees which related to certain relevant proceedings in the Supreme Court of the United States. Speaking for the court, Mr. Chief Justice White said:

"We come, first, to test the question as to attorney's fees in this court, as it is the most important and far-reaching, since it involves considerations of the gravest importance, going to the entire structure of our system of government, based as it is upon an absolute denial of any power whatever in the court below to deal with the subject, while the other two contentions at best challenge power but relatively or partially.

"*First.* The question of the power of the court to make the allowance for professional services rendered in this court on the former writ of error. There can be no doubt that, tested by the general principles of law controlling in this court, by the statutes of the United States relating to the subject or the rules of this court concerning the same, the award for the attorney's fees in question was absolutely unwarranted. We do not stop to review and expound the settled line of authority demonstrating this result, because it would be wholly superfluous to do so, as the principles have been so long the settled rule of conduct in this court and are so elementary as to require not even a reference to the cases. * * *

"The question is, then: Was the court below right in holding that it had the power, because the Kansas statute so authorized to assess as against one party to a suit in the Supreme Court of the United States a sum for attorney's fees for services rendered in that court as against another party to the suit, although such assessment, as we have seen, was not authorized by

the law of the United States, but was in conflict with the settled rule in the Supreme Court of the United States? * * * We might well go no further, but in view of the importance of the subject we briefly advert to one or more of the obvious consequences which would arise from maintaining the principle. It would follow, of course, that the right to freely seek access to the Supreme Court of the United States would cease to exist, since it would be in the power of the states to burden that right to such a degree as to render its exercise impossible. * * * "

In Wetmore v. Mellinger, 64 Iowa, 741, 18 N. W. 870, 52 Am. Rep. 465, the court, in deciding that an action will not lie for the institution of a civil action with malice and without probable cause, where there has been no arrest of the person or seizure of property and no special injury sustained, well expressed the outstanding thought here controlling:

"The courts are open and free to all who have grievances and seek remedies therefor, and there should be no restraint upon a suitor, through fear of liability resulting from failure in his action, which would keep him from the courts."

Never was it more necessary than now to preserve unimpaired this right so vital to the public welfare and so thoroughly a part of our theory of government. New economic problems increasingly arising in a constantly developing nation require solution, and hence lead to legislation. The statutes thus enacted to meet these problems can rarely, if ever, be so certain and detailed in expression that their meaning or extent can be ascertained without judicial determination. The difficulty which attends their construction is best shown by the wide variance in the opinions of the courts and the constant resort to the Supreme Court for authoritative decision. It is thus not strange that lawyers and laymen may differ as to the meaning of such statutes, and it would be a negation of the principle and right of free access to the courts to hold that the submission of rights to judicial determination involved a dangerous gamble which might subject the loser to heavy damage.

## 2. The Other Items of Damage.

Plaintiffs had the right to purchase Victor goods in a free market. This right was invaded by defendants, and plaintiffs were forced to buy in a closed market created and held by the illegal combination. The theory of plaintiffs is that they could have bought from distributors at discounts of 40, 10, and 2 per cent. from list price all the Victor goods for which they were compelled to pay a higher price. Upon this theory, plaintiffs introduced their proof, and were sustained by the trial judge in his rulings and his charge to the jury.

The total purchases made by plaintiffs in the manner later described of Victor's goods after May 1, 1914, the date of the circular letter cutting off plaintiffs, and before September 7, 1917, when this action was commenced, was $278,689.77. If from this amount the 40–10 discount had been deducted, the goods would have cost plaintiffs $235,-565.18, or $43,124.59 less than they paid. Deducting the 2 per cent. for cash 10 days—i. e., $4,711.30—and adding this amount to the $43,124.-59, and subtracting $46.82 to correct an error, the net amount which

plaintiffs paid over discounts allowed to those in the combination was $47,789.07. The details are summarized in the table noted in the margin.[3] From this must be deducted the sum of $7,193.23 disallowed by the jury for discounts after May 29, 1917, and the resulting balance of $40,595.84 represents the sum of the items of $26,193.58 and $14,-402.26 submitted to the jury by the court. It will be recalled that the verdict of the jury found the larger item in favor of plaintiffs, but reduced the smaller one to $7,701.13.

### 3. The Rule of Damage.

[2] It is first necessary to describe the methods by which Macy's bought Victor goods.

(a) When a customer of Macy's desired Victor merchandise for immediate delivery, which Macy's did not have in stock, a purchase was made either by the "comparison" department or the cash purchasing office of the "receiving" department. The former was in charge of Miss Sowa and Miss Yeamans from May 1, 1914, to September 1, 1915; the latter was in charge of Michael Peyser. Prior to May 1, 1914, there were no purchases through these departments, but after that date, when Macy's were cut off from the regular source of supplies, they were compelled to maneuver for goods, getting them when, where, and in such quantities as they could.

When, therefore, a customer wished to buy a record which Macy's did not have in stock, a shopper under the direction of Miss Sowa or Miss Yeamans, or a boy under the supervision of Peyser, was immediately sent to a convenient Victor store and the desired record was procured at full retail price. The total cost of these purchases was

| | [3] Amount Paid | List Less 40–10 | Difference |
|---|---|---|---|
| Sowa | $ 5,929.25 | $ 3,471.82 | $ 2,457.43 |
| Yeamans | 18,447.85 | 10,356.65 | 8,019.20 |
| Peyser | 10.012.03 | 6,566.30 | 3,445.73 |
| Oliver | 47.779.27 | 42,426.41 | 5,352.86 |
| Williams | 45,547.12 | 36,738.19 | 8,808.93 |
| M. A. Fisher | 61.643 91 | 58,708.49 | 2,935.42 |
| Globe Talking Machine | 41,659.39 | 36,754.56 | 4,904.94 |
| Foss | 13,763.67 | 9,784.56 | 3,969.11 |
| Fischer Talking Machine | 12.892.72 | 12,209.13 | 683.59 |
| Henry Feld | 1,279.75 | 908.36 | 371.49 |
| Reliable Purchase | 6,133.14 | 5,736.73 | 396.41 |
| B. Epstein | 615.35 | 497.07 | 118.28 |
| Philadelphia Talking Machine | 125.57 | 114.14 | 11.42 |
| F. B. Roth | 5,685.14 | 5,162.97 | 515.17 |
| Kelly Music Company | 3,862.79 | 3,493.83 | 412.51 |
| H. N. Straus | 3,319.82 | 2,626.17 | 693.65 |
| Bertha Wickerd | ........ | ........ | ........ |
| | $278,689.77 | $235,565.18 2% | $43,124.59 4,711.30 |
| | | | $47,835.89 46.82 |
| | | | $47,789.07 |

$34,389.13; i. e., about 12 per cent. of the total purchases by Macy's during the controverted period. Had Macy's been able to buy these goods from distributors at 40–10 off, and then 2 per cent. off for cash, the cost would have been $14,402.26 less than $34,389.13, the amount paid out. As to this item, the jury awarded not quite half; i. e., $7,701.13.

(b) Macy's had a joint purchasing office, first in charge of one Oliver, and later of one Williams. Each testified that during the period in question he bought Victor goods, and personally paid the amounts of the invoices, and was reimbursed therefor by plaintiffs. The total lost discounts on purchases thus made aggregated $14,161.79, and proof of these purchases is apparently not questioned.

(c) Payment of the remaining purchases was made by plaintiffs' check through their comptroller's office. These purchases were accomplished under varying circumstances and difficulties and Macy's purchased for the lowest price it could. Of this the purchase from one Fisher, mentioned in the table, supra, who in turn had purchased from one Switky, is illustrative; for Macy's paid Fisher $61,643.91, which was only $2,935.42, or 5 per cent. above regular dealer's price. The details as to the remaining items referred to in the table need not be set forth.

(d) From the record it is plain that there were ample goods in the market—i. e., in the hands of distributors—from which to have supplied Macy's needs. There was evidence sufficient in character to show that Macy's could get goods in an unrestricted market; for certainly, if by resort to the methods and maneuvers forced upon plaintiffs by the closed market they nevertheless obtained what they did, a jury was well justified in concluding that in an open market they would have been able to buy what they desired for their business requirements. We mention this because the court cautiously required plaintiffs to prove perhaps more than was necessary.

[3, 4] The court in colloquial language in its charge said:

"Now, what is the nature of those damages? If a man can go out in an open and free market and buy goods at a certain price, and then, because the market is closed to him illegally and he is compelled to pay more, his damage is the difference between what he would have paid in an open and free market and what he actually did pay under the conditions of the illegally closed market. Now, of course, there was not any free and open market, in any event, until May 29, 1917. There was, however, a market price in the kind of market that there was, the only kind of a market that there was, and there was a regular price at which dealers could get goods from the distributors in the market that existed, namely, dealers in the Macy class at 40, 10, and 2. Macy's were compelled to pay higher prices if they wanted to get goods. They had a legal right to get goods; they had a legal right to go out and buy as many goods as they could or wanted to, and they are entitled to recover, as their damages, the difference between what they would have paid for such of the goods that they actually got, as they could have gotten in the open market, if there had been an open market, and what they actually had to pay for such of the goods that they actually did get, as they could have gotten if there had been an open market, provided they acted reasonably in making these payments."

This, as will appear infra, was the most to which defendants were entitled. The court, however, also charged:

297 F.—51

"I say, if there is evidence apart from the comparison and receiving departments, if there is evidence as to the others, which in your judgment would justify you in saying that Macy's could not have gotten all or any of these goods in a free and open market for any reason, *whether it was because the defendants didn't like their method of doing business, or had a personal aversion to them, or because there was a shortage, and they couldn't have gotten them for that reason, or because they cut them off altogether, or anything of that kind;* if they couldn't under any circumstances have gotten the amount of goods that they wanted, then as to so much as they would have fallen short the damage would be due to that cause, or it would not be a damage due to the illegal combination. But you must be able to say if there is some evidence upon which you can base such a conclusion. Further, the same thing would apply, not only as to quantity, but as to price: If you come to the conclusion that there is evidence here from which you can determine that in a free and open market Macy's could not have gotten the goods at the dealer's discount, or that the dealer's discount would not have been what it was, and that therefore they would not have suffered this difference, then to the extent that you can so say, of course, the loss is not due to the illegal combination."

There is evidence in the record that certain dealers would like to have sold Macy's, but feared so to do. There is evidence by others that they would not have sold them. The jury decided that point for plaintiffs. But the rule of damages is much simpler than that for which defendants contend. They insist that the jury was left to speculation because some distributors testified that they would not have sold Macy's, and because plaintiffs engaged in a cut-price competition with other retailers, and they argue, in effect, that plaintiffs did not sustain what may be characterized as the metaphysical burden of showing that they could have purchased in a free market the same amount of goods at the customary list prices less discounts. If there is speculation, it is that indulged in by defendants.

The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery. Of this Wakeman v. Wheeler, etc., Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676, is now a classic illustration. In Pressed Steel Car Co. v. Union Pacific R. Co. (C. C. A.) 270 Fed. 518, this court, citing many well-known cases, including Hetzel v. Baltimore & Ohio R. Co., 169 U. S. 26, 18 Sup. Ct. 255, 42 L. Ed. 648, recently reiterated this principle. On a new trial, it developed that the damages there referred to could be proved, and the judgment resulting therefrom has just been affirmed. Pressed Steel Car Co. v. Union Pacific R. Co., 297 Fed. 788, decided January 25, 1924.

In many cases, under section 7 of the Sherman Act, the attempt has been made to prove loss of anticipated profits, and either because a plaintiff failed in his proof, or was unable to set up a proper standard of comparison, he consequently failed to recover. Locker v. American Tobacco Co., 218 Fed. 447, 450, 134 C. C. A. 247; Central Coal & Coke Co. v. Hartman, 111 Fed. 96, 49 C. C. A. 244; Victor Talking Machine Co. v. Kemeny (C. C. A.) 271 Fed. 810; Eastman Kodak Co. v. Blackmore (C. C. A.) 277 Fed. 694, 21 A. L. R. 1506.

[5] In the case at bar, plaintiffs have not sued for damages due to loss of profits. Their position is that they were entitled to buy goods

in a free market; that they were prevented from doing this by defendants' illegal combination; that they were forced, therefore, to buy in the market which defendants had created, and were thus compelled to pay more for their goods than the price which in that market was the fair and reasonable price established by defendants themselves.

Plaintiffs contend, and rightly, that they were not forced to sue for damages for loss of profits, and thus run the risk of no recovery, because, plainly, the restrictive arrangement prior to May 1, 1914, furnished no standard of comparison with sales made, or profits increased or lost, by plaintiffs during the period thereafter, when they could sell as they pleased. They contended for a rule of damage which seeks the proximate cause of damage and the proximate result occasioned by that cause. In a case just decided, dealing with an entirely different question, Mr. Justice Holmes has used a terse phrase here applicable:

"On the other hand, the common understanding is that in construing these policies we are not to take broad views. but generally are to stop our inquiries with the cause nearest to the loss." Queen Insurance Co. of America v. Globe & Rutgers Fire Insurance Co., 44 Sup. Ct. 175, 68 L. Ed. ——, decided January 7; 1924.

And in Southern Pac. Co. v. Darnell-Taenzer Lumber Co.. 245 U. S. 531, 533, 38 Sup. Ct. 186, 62 L. Ed. 451, the same justice said:

"The general tendency of the law, in regard to. damages, at least, is not to go beyond the first step."

Here the defendants themselves adduced testimony that the price charged by distributors to dealers under the price, schedule of Victor Company was reasonable. The jury must have so found. Plaintiffs were compelled to pay more than this reasonable price. Why? Manifestly because the illegal combination forced them so to do in order to carry on the requirements of their business. Whether, then, plaintiffs sold to their customers at a profit or loss becomes immaterial in this case. They were entitled to goods at the reasonable price thereof. Through no legal fault of theirs, but because of defendants' wrong, they were deprived of their right, and the jury could find that such deprivation defined in money was the difference between the established reasonable price and the amounts plaintiffs were compelled to pay, provided as the trial judge charged, "they acted reasonably in making these payments." Thomsen v. Cayser, 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322; also see 166 Fed. 251, 253, 92 C. C. A. 315; Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U. S. 390, 27 Sup. Ct. 65, 51 L. Ed. 241; Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608. It is thus unnecessary to "go beyond" this "first step."

[6] It is contended, however, that such a rule cannot be sound here, because, inter alia, Macy's sold for cash to customers at destructive prices, and also, inter alia, that the distributors would not, for that reason, have sold Macy's. The answer is not difficult. We are not concerned with the trade or economic results of price cutting. We are concerned only with the legality of the business done by Macy's. They had the right to sell at any price they pleased; they likewise had the

right, by cutting prices and advertising extensively, to augment the demand for Victor goods, and the fact that they exercised these rights could not affect their right to get goods. Undoubtedly, any distributor could have refused to sell Macy's. United States v. Colgate, 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443; Federal Trade Commission v. Raymond Bros.–Clark Company, 44 Sup. Ct. 162, 68 L. Ed. —— (citing the recent cases), decided January 7, 1924. But that refusal could not·be exercised legally, if part of a combination or conspiracy in violation of the statutes here concerned. What the distributors would have done, if free and unhampered, is truly a matter of speculation; for such human action can never be ascertained until a man is called upon to act, rather than if he is merely asked what his mental attitude would have been in the past, or would be in the future, if confronted with the necessity of decision.

But, passing this observation, the verdict of·the jury amounted to a rejection of the evidence of those distributors who testified that they would not have sold Macy's in a free market, and at least a conviction, on all the evidence, that Macy's could have obtained the goods in a market where distributors were not deterred by adherence to the illegal system. We conclude, therefore, that the court not only stated the law correctly on this branch, but out of wise caution gave defendants the benefit of rulings and instructions more favorable to them than was necessary.

[7] In respect of the purchases at retail the court charged:

"If the jury find that in the case of the special purchases through the receiving and the comparison departments, covered by the Sowa, Yeamans, and Peyser vouchers, from sources other than Victor distributors, plaintiffs would have had to go to such sources other than Victor distributors, had the Victor license system not been in operation, and pay the price for the purchases which plaintiffs claims they were compelled to pay, the jury cannot award any damages for increased purchasing costs in any transaction where such condition is found to exist.

"If the jury find as stated in the last preceding request, they cannot award any damages for increased purchasing costs on any purchases made through plaintiffs' comparison or receiving department."

Macy's had the right to buy at retail, provided, of course, such purchases were made in good faith, and provided that course was the direct result of the illegal combination which prevented them from having stock on hand· sufficient to satisfy the demand of their customers. The purpose of the court's charge was to safeguard defendants against excessive damages on this branch of the case. The jury awarded plaintiffs $7,701.13 in respect of purchases at retail, and not $14,402.26. Whether or not the reduction was due to this part of the charge we cannot know, and with the jury's method of arriving at the result we have no concern. In any event, the instruction was sound, and the most to which defendants were entitled.

### 4. The Proof of Purchases.

[8] Defendants insist that the trial court erred in receiving in evidence invoices as proof of certain amounts paid by plaintiffs to purchase Victor goods, where there was no testimony of the persons who actually

made the purchases. We shall not go into the detail of the purchases in controversy. One illustration will suffice:

The shoppers, for instance, under Miss Sowa and Miss Yeamans, were not called. They made purchases from the retailers, but, because of the bitter fight, they were not long useful, as they might be identified as Macy's shoppers. Hence they were not kept in Macy's employ, or used, for much over a month. At times as many as 20 women shoppers were thus employed, and obviously it was impossible to produce these and others as witnesses. Macy's, however, in respect of these and all controverted purchases, had a most elaborate and careful system. Thus, for example, every so-called invoice in the comparison department was an original memorandum of the transaction in the handwriting of Miss Sowa or Miss Yeamans, and represented transactions of which they personally had charge, and the shoppers reported contemporaneously with the transactions.

To apply in this case the old-time rule of requiring testimony by the shopper or actual purchaser would amount to a denial of justice. We recognized in The Spica (C. C. A.) 289 Fed. 436, that courts must keep pace with the problems of administration developed by large business enterprises. We know and appreciate the difficulty of proving the actual mailing of a letter by an office boy, when hundreds of letters daily issue from large business houses. We likewise know and appreciate the impracticability of producing so-called common-law proof of every detail of purchase or sale in a large business like that of plaintiffs. The progress of men and affairs constantly presses on the common law, and makes it yield, with traditional elasticity, to the requirements of the times and thus, recognizing these requirements, we followed Dean Wigmore and expressed ourselves accordingly in The Spica. We may repeat, as pertinent here, what was said for the court in that case by Judge Hough:

"The result intended is to give to vendors and contractors, in a way of business requiring many and shifting workmen and complex accounting systems, an opportunity of making prima facie proof in accord with the business habits of the times; further to impose on the trial court the duty of deciding whether necessity and trustworthiness have been established as the prerequisites of admissibility; and finally to leave to the fact triers, whether judges or juries, the question of credibility, no matter what apparatus of papers may constitute the resulting evidence. * * * This branch of legal administration ought not to be regarded as capable of fixation, any more than are the business habits out of which it grows. At present we think the foregoing furnishes to large employers, performing complicated work by many hands, a reasonable means of proving to fair men by fair means what they have done and how much it cost to do it."

## 5. The Allowance of $35,000 to Counsel.

[9-12] The trial judge gave this subject the most careful consideration, and he, of course, was in the best position to judge what was fair and reasonable. The court properly stated:

"A reasonable attorney's fee in New York, for New York attorneys, is to be measured by New York standards of fees ordinarily charged."

We assume that the court was not making any geographical distinction in respect of the ability of attorneys, but was referring to the local

standards necessitated and developed by the fact that there has been a great increase in the expense of conducting law offices, as well as the increase in the cost of living. It is matter of common knowledge that there has been a very great rise in rentals in business sections where attorneys ordinarily must have their offices, as well as a substantial advance in the compensation accorded to their employés, and, when an allowance is to be made, the court must give these facts consideration. Laymen rarely fail to figure a transaction on the basis of net profit, but, curiously, the compensation of attorneys is frequently discussed and thought of as if the attorney was the beneficiary of the whole amount awarded, without remembering that he, like the business man, must first pay expenses before he can determine what he has really earned for the support of himself and those dependent upon him.

This case required a very great amount of preparation, the trial was protracted, and plaintiffs had the services of a firm of three attorneys. These attorneys tried the case with marked ability. They were opposed, not only by the able and skillful lawyers who represented the defendants at the trial, but also, in certain phases, by other counsel of high distinction. In determining what is a reasonable fee, many elements must be considered, and some of these are the character of the services rendered, the manner in which rendered, the time occupied, and the result attained. Not the least important element is the responsibility which rests upon counsel. It was not easy in this case to determine the theory upon which it should be tried. That determination demanded the courage of selection. If the action had been planned and tried upon a wrong theory, it would have failed, and thus it is that ability should be recognized as an attribute not to be measured by a yardstick.

The trial judge felt that as between attorney and client a much larger allowance would not have been unreasonable, but he made the allowance which he did, having in view, inter alia, the extent to which plaintiffs were successful; i. e., the amount of the verdict. Bearing this in mind, the trial judge was right, and certainly well within his judicial discretion, in awarding $35,000.

In view of our decision, which eliminates from the case $47,412 (i. e., $15,804 trebled), we feel constrained to reduce the allowance to $30,000. In so doing, we are not to be understood as underestimating in the slightest the merit of the services rendered by the attorneys for plaintiffs; but this reduction is due solely to the fact that the final result will be less than that for which the judgment below was recovered. Whether the statute contemplates that the attorneys for plaintiffs would have been entitled to an award of a reasonable fee in this court need not be determined. As plaintiffs have not been wholly successful here, we would not feel justified in making an award, even had we power so to do.

### 6. Plaintiffs' Writ of Error.

[13] Plaintiffs expended sums for stenographer's minutes and other disbursements stated to have been necessarily incurred in the prosecution of the action. These expenditures were not taxed, as not being "costs of suit." It will be noted that under section 7 of the Sherman Act the words used are "the *costs* of suit," while under section 4 of the

Clayton Act the words used are "the *cost* of suit." No explanation is found in the report of any congressional committee for the use of the singular "cost" in the Clayton Act, instead of the plural "costs" in the Sherman Act. We do not regard this difference as significant, for, in our view, if it had been intended that "cost of suit" should mean anything different from "costs of suit," that intention would, in some manner, have been made clear. Each of these phrases is followed by the words "including a reasonable attorney's fee," and this we think makes clear that the difference between "cost" and "costs" in these statutes is probably merely accidental, because if, under the Clayton Act, it had been intended to include the expenses "of suit," there would hardly seem to be any reason for adding the words "including a reasonable attorney's fee," in view of the fact that an attorney's fee would necessarily be a part of the expense incurred in conducting such a litigation. While, under equity rule 50, stenographer's fees are taxable as costs, there is no provision for taxing such fees in actions at law in the federal courts.

[14] 7. It would be unfortunate if it were necessary to retry this cause, as such course would lead to further expense and delay, and take up much time in an already overburdened court, where the trial of causes is considerably in arrears. The sole error can be corrected by computation, and, for that reason, we think that the case does not fall within Slocum v. New York Life Insurance Co., 228 U. S. 364, 33 Sup. Ct. 523, 57 L. Ed. 879, Ann. Cas. 1914D, 1029, and that we may follow the precedent of Van Boskerck et al. v. Torbert, 184 Fed. 419, 107 C. C. A. 383, Ann. Cas. 1916E, 171, which also was followed in a much more difficult situation in U. S. v. Benedict (C. C. A.) 280 Fed. 76, 83, affirmed 261 U. S. 294, 43 Sup. Ct. 357, 67 L. Ed. 662. See, also, Loewer v. Harris, 57 Fed. 368, 6 C. C. A. 394, Cloquet Lumber Co. v. Burns, 207 Fed. 40, 124 C. C. A. 600, and Royal Italian Government v. National Brass & Copper Tube Co., Inc. (C. C. A. 2d Circuit, decided November 5, 1923) 294 Fed. 23.

The item as to attorney's fees included in the verdict is separable. It was specifically set forth in paragraph nineteenth of the complaint, and described in paragraph fourth of plaintiffs' bill of particulars of October 28, 1919. We think, as matter of law, that it may be dealt with separately in the manner hereinafter stated. As the allowance of attorney's fees under section 7 was not the subject-matter of jury action, this court can and does direct the District Court to reduce the judgment, by deducting the $5,000, with interest from the date of the judgment.

It is ordered that, if plaintiffs below within 20 days after this opinion is filed shall file a remittitur of $47,412, with interest from the date of the judgment below, in the office of the clerk of the District Court for the Southern District of New York, and a certified copy thereof in the office of the clerk of this court, the judgment, less the amount so remitted, and less $5,000, with interest from the date of the judgment, will be affirmed, without costs in this court. If this shall not be done, the judgment will be reversed, without costs.

The issuance of the mandate will be delayed for 20 days.

MANTON, Circuit Judge (dissenting in part). I am in accord with much of the prevailing opinion. I dissent from the disallowance of damages sustained by the plaintiff below for counsel fees paid for defending the alleged patent infringement suit. There the bill was held to have no merit, and, on the contrary, it was, in substance, held to be a disguised attempt to control the prices of its machines after they were sold and paid for. Straus v. Victor, 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955. It brought forth the following statement in the opinion:

"That the plaintiff comes into court with a bill to enjoin the defendants from reselling machines secretly sold to them in large numbers by the plaintiff's agents indicates very clearly that, at least until the exigency out of which this case grew arose, the scheme was regarded by the plaintiff itself and by its agents simply as one for maintaining prices by holding a patent infringement suit in terrorem over the ignorant and the timid."

Thus the purpose was plain to the Supreme Court on the plaintiffs' own bill. Moreover, complete evidence presented to the jury below resulted in a finding by it that this so-called patent infringement suit was not brought in good faith or candor, and was a step in an unlawful conspiracy, the purpose of which was to maintain an illegal system for maintaining prices. Upon evidence fully warranting this finding, the learned trial judge instructed the jury:

"Another element of damages is the fees and expenses which it has been testified have been incurred in the defense of the infringement suit. Now, there are several questions that you must determine before you can allow that amount or any part of it. Let me again try to clear the atmosphere as to the legal question involved here. The Victor Company had a perfect legal right to bring a suit for infringement of its patent rights; and if this suit was a suit purely and simply to enforce its patent rights, there could be no recovery. It would not make any difference whether it was right or wrong about that; they had the right to go ahead and do it. On the other hand, if this suit was not purely and simply to enforce its patent rights, but if it was a step taken in pursuance of the combination that then existed, for the purpose of making that combination stronger, or to scare people, or anything of that kind, if it was a step in the combination, and not the independent act of the Victor people in pursuance of their patent rights, then they would be liable for the damages suffered, and it would not make any difference whether or not they believed that their combination was legal, or whether they thought it was illegal. It would not make any difference what any lawyers had told them as to whether their combination was legal or illegal, just as it makes no difference in the whole case as to whether or not they believed, in August, 1913, or thereafter, or whether they still believe, that the Supreme Court is wrong, and that the combination was perfectly legal.

"If, as the Supreme Court has held, and therefore as it is settled for us, the combination was an illegal one, and these agreements were illegal, and if the patent suit was brought simply as a step in the carrying out of that combination, then they are liable, and the other defendants, who were a part of that combination, are liable, for the damages caused in that step in carrying out the combination. Now, as bearing on that, you have the right to consider, first, that the Victor people had valid patents, and that they had a right to enforce those valid patents. You are to consider, on the question of whether they were acting merely in the enforcement of the patents, or as a step in the combination, the letters that were written to them about what they were going to do about Macy's, and as to whether those indicate or do not indicate to your mind that the thing that was being urged was some such step as this, and that the step was taken as part of the

combination; and you are to consider, of course, in that connection, anything else in the evidence that you deem relevant to the determination of the question.

"Now, again, the plaintiffs have got the burden of satisfying you by the weight of the evidence that this was a step in the combination, in the furtherance of the combination, and not merely an independent patent suit. If they fail to satisfy you as to that in that way, then they cannot get any damages because of that; if they do satisfy you in that way, then they are entitled to the reasonable payments that they were put to because of that. It has been testified, also, that the actual payments were $15,804. Testimony has been offered that that was reasonable, and no testimony has been offered against that. It does not follow, because no testimony has been offered against it, that you are bound to accept that as a reasonable charge; it does not follow that, because Macy paid that amount, therefore they must have suffered that damage. It follows only that, if they are entitled to damages, they are entitled to it, if they paid it, as has been testified to, and if what they paid was reasonable."

Thus the theory of liability for counsel fees is based on the nature of this conspiracy action under the Sherman Law. In the cases referred to in the prevailing opinion (Oelrichs v. Spain, 15 Wall. 211, 21 L. Ed. 43; Flanders v. Tweed, 15 Wall. 450, 21 L. Ed. 203; Tullock v. Mulvane, 184 U. S. 497, 22 Sup. Ct. 372, 46 L. Ed. 657; Mo., Kan., etc., Ry. v. Elliott, 184 U. S. 530, 22 Sup. Ct. 446, 46 L. Ed. 673) there is no finding of fact, as here, that the bringing and prosecution of the suits were part of the unlawful scheme and design to make effective the chief object of the unlawful conspiracy. The general principle of the cases cited has long been recognized, and seems to be by the plaintiffs below. They adhere to the rule that the mere bringing and prosecution of a suit is not a wrongful act, without regard to its merits or its outcome. Resort to the courts is an individual's legal right, and counsel fees are denied as damages, not because they are incapable of being an element of damages, and directly resulting from violation of right, but because in such cases the bringing of suit was not a wrongful or illegal act, and no legal right was therefore violated. But this suit was wrongful, and found to be an illegal act. It was begun to accomplish an illegal end (so the jury found), and the authorities based on the proper exercise of a legal right, have no application. This is an action in tort, and the damages recoverable depend upon whether the act complained of is unlawful. Whether damages are recoverable under the Sherman Law depends upon whether the act or acts complained of are within the prohibition of the statute. If they are, and therefore illegal, and are the direct cause of injury, then under section 7 such damages are recoverable.

As the jury has said, the so-called patent suit was designed primarily to further the objects of the unlawful conspiracy, and such a step was illegal. The character and the effect of a conspiracy must be looked at as a whole. United States v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518. Even acts absolutely lawful may be steps in a criminal plot. Aikens v. Wisconsin, 195 U. S. 206, 25 Sup. Ct. 3, 49 L. Ed. 154. For a series of such acts, if the result of a concerted plan or plot between the defendants to thereby se-

cure the control of the sale of commodities in the markets and suppress competition in prices, would come plainly within the terms of the statute and as part of the scheme or plot would be unlawful. United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243. There is a finding here that the motives and inducements of a suit decided adversely to the defendants below affected the combination and constituted a wrong. The Sherman Law is a limitation of rights which may be pushed to evil consequences, and therefore restrain, even though the offender depends upon patent rights or a license thereunder. Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107. No rule of public policy giving free access to the courts is available to the defendants below, who, after a trial, have been found to have used the court as an instrument to accomplish unlawful acts and as a means to profit by an illegal conspiracy. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007. Statutory costs were never intended as compensation for an action wrongfully maintained.

Nor is this an action for malicious prosecution. It is for unlawful conspiracy, followed by wrongful acts, among which is the institution and maintenance of this so-called patent suit. Probable cause for the suit is important in the defense of a malicious prosecution action, but the plain issue here was whether or not the so-called patent suit was oppressively maintained and used as an instrument for the unlawful combination to suppress and destroy competition. Here there was first established the combination, and thereafter the evidence surrounding the patent litigation was received. It was shown to be directly in line with the objects of the conspiracy. In resisting that suit, the plaintiffs below incurred the counsel fees which they now seek in reimbursement as an element of damage resulting from the wrongs committed against them by this unlawful combination in restraint of trade. This defense was imperative, in order that the plaintiffs below might protect their rights as against the tortious conduct of the defendants below. They were obliged to do this to meet the wrongdoing of the defendants below, and the counsel fees incurred were an immediate and direct result. It is now settled that the consequences of violation of the Sherman Law cannot be avoided by the testimony of witnesses that the violators have acted upon advice of able and eminent counsel. Indeed, such evidence has been held to be immaterial and irrelevant. Harriman v. Northern Securities Co., 197 U. S. 298, 25 Sup. Ct. 493, 49 L. Ed. 739; Standard Sanitary Mfg. Co. v. United States, 226 U. S. 50, 33 Sup. Ct 9, 57 L. Ed. 107; United States v. Patten, 226 U. S. 543, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Thomsen v. Cayser, 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322.

A suit of the nature prosecuted by the defendants below is peculiarly a strong instrument in the hands of an unlawful combination to suppress and destroy competition. The sinister intent and illegal object of the basic conspiracy in which the suit is but a step, and yet an integral part, and constitutes a wrongful act, is the material object. The Supreme Court said in Straus v. Victor Co., 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955:

"Convinced  *  *  *  that the purpose and effect of this 'License Notice' of plaintiff, considered as a part of its scheme for marketing its product, is not to secure to the plaintiff any use of its machines, and as is contemplated by the patent statutes, but that its real and poorly concealed purpose is to restrict the price of them, after the plaintiff had been paid for them and after they have passed into the possession of dealers and of the public, we conclude that it falls within the principles of Adams v. Burke, 17 Wall. 453, 456, 21 L. Ed. 700, 703, and of Bauer v. O'Donnell, 229 U. S. 1, 57,  *  *  * that it is therefore invalid, and that the District Court properly held that the bill must fail for want of equity."

Pursuant to Sherman Act, § 7, when a wrong has been done and the law gives a remedy, the compensation shall be equal to the injury; the latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed. Wicker v. Hoppock, 6 Wall. 94, 18 L. Ed. 752. Whatever is done by those engaged in the scheme or plot, with the motive or intent to carry out the unlawful purpose itself, it becomes tainted with the illegality of the scheme, however innocent it might otherwise have been, and the separate acts become thereby so interwoven with the unlawful scheme as to cause injury by reason of the combination and fall within the language of section 7. Monarch Tobacco Works v. American Tobacco Co. (C. C.) 165 Fed. 774.

There are many instances recognized in the law which indicate that the expenses of litigation and counsel fees incurred by the wrongful acts are elements of damage. Counsel fees are recoverable as compensatory damage in cases of malicious prosecution. Blunk v. Atchison. T. & S. F. R. Co. (C. C.) 38 Fed. 311; Chambers v. Upton (C. C.) 34 Fed. 473; Tiblier v. Alford (C. C.) 12 Fed. 262; Farris v. Messimore, 219 Ill. App. 582; Ziegler v. Powell, 54 Ind. 173. The rule in Massachusetts allows recovery for counsel fees as a direct and necessary result of the defendant's wrongful act in violation of the terms of a surety agreement. Wheeler v. Hanson, 161 Mass. 370, 37 N. E. 382, 42 Am. St. Rep. 408; Pond v. Harris, 113 Mass. 114; Faneuil Hall Ins. Co. v. Liverpool, L. & G. Ins. Co., 153 Mass. 63, 26 N. E. 244, 10 L. R. A. 423. Refusal to defend a suit by an assured against the insurer makes the insurer liable for counsel fees and other legal expenses as part of the general damages arising from breach of duty. N. Y., etc., Ins. Co. v. Protection Ins. Co., 1 Story, 458, Fed. Cas. No. 10,216; Jackson v. St. Paul Ins. Co., 99 N. Y. 124, 1 N. E. 539. Recoveries of counsel fee have been allowed for a defendant's failure to perform a primary duty, and where a plaintiff has been put to the expense of litigation, even in the absence of contract. Westfield v. Mayo, 122 Mass. 100, 23 Am. Rep. 292; Chesapeake & Ohio Co. v. Alleghany Co., 57 Md. 201, 40 Am. Rep. 430; Oceanic Steam Nav. Co. v. Compania T. E., 134 N. Y. 461, 31 N. E. 987, 30 Am. St. Rep. 685. It is the rule in England that, where the natural and proximate consequences of the defendant's tortious act is to involve the plaintiff in litigation with others, he is entitled to reimbursement for counsel fees. Dixon v. Fawcus, 3 El. & El. 637. This rule has been followed in the courts of this country. Chambers v. Upton (C. C.) 34 Fed. 473; Philpot v.

Taylor, 75 Ill. 309, 20 Am. Rep. 241; McGaw v. Acker, Merrall & Condit Co., 111 Md. 153, 73 Atl. 731, 134 Am. St. Rep. 592; Stiles v. Municipal Council of Lowell, 233 Mass. 174, 123 N. E. 615, 4 A. L. R. 1365. We are not referred to any authoritative decision of the Supreme Court to the contrary.

The allowance of counsel fee as an element of damage in the instant case must be considered with due regard for the intention of Congress in providing for compensatory damages for wrongs committed under the Sherman Act. Undoubtedly, the direct consequences of the wrongful act of the defendant below was the expense of the employment of counsel. Reasonable value of this service is fixed by the testimony. Evidence as to the reasonableness of the service and the value thereof is as common as fixing the value of labor in any other pursuit. Head v. Hargrave, 105 U. S. 49, 26 L. Ed. 1028. The practical effect of such a loss under such circumstances as this record discloses calls for that progress in the law as to meet the progress of the times. The fact that the statute trebles the damages does not affect the situation. The Sherman Act is to be liberally construed to repress the evil and advance the remedy. Chattanooga Foundry Co. v. Atlanta, 203 U. S. 390, 27 Sup. Ct. 65, 51 L. Ed. 241; Ware, etc., Tobacco Co. v. American Tobacco Co. (C. C.) 178 Fed. 117.

In Missouri Pacific v. Larabee, 234 U. S. 459, 34 Sup. Ct. 979, 58 L. Ed. 1398, a dispute arose for demurrage between the railroad company and the flour mills to enforce payments suspended for rendering switching service which the railroad company had theretofore regularly performed for the mills company. Mandamus proceedings to compel the continuance of the services were instituted. Under a state statute it was held that the power to assess, as against one party to a suit, a sum for attorney's fees for services rendered in the court as against the other party to the suit, was not authorized by the laws of the United States or by the rules of the Supreme Court. In other words, the statute was held to be a burden to the right of access to the court. It is not in point here, for in the instant case invoking the aid of the court has been held to be a wrongful act and an instrument used in aid of the unlawful conspiracy. The counsel fee paid was properly considered as an element of damage.

Taking this view, I see no occasion to reduce the allowance of $35,000 awarded by the court after the rendition of the verdict herein. The judgment below should be affirmed.